## BLACKMER v. UNITED STATES.
### Nos. 5131, 5132.

Court of Appeals of District of Columbia.

Argued Feb. 4, 1931.

Decided April 6, 1931.

Frederick DeC. Faust and Charles F. Wilson, both of Washington, D. C., Eugene D. Millikin and Karl C. Schuyler, both of Denver, Colo., and George G. Battle, of New York City, for appellant.

Leo A. Rover, U. S. Atty., of Washington, D. C., and Atlee Pomerene, of Cleveland, Ohio (Frank Harrison, of Cleveland, Ohio, of counsel), for the United States.

Before ROBB and VAN ORSDEL, Associate Justices, and COX, Associate Justice of the Supreme Court of the District of Columbia.

ROBB, Associate Justice.

In No. 5131, appellant, Harry M. Blackmer, was adjudged guilty of contempt of the Supreme Court of the District in failing to respond to a subpœna to appear on October 17, 1927, as a witness on behalf of the United States at the trial of Harry F. Sinclair and Albert B. Fall in that court on a criminal charge of having conspired to defraud the United States in violation of section 37 of the Criminal Code (18 USCA § 88).

In No. 5132, a mistrial of the Sinclair-Fall conspiracy case having been declared on November 2, 1927, appellant was again subpœnaed to appear on Monday, April 2, 1928, as a witness on behalf of the United States at the retrial of the case. Again he failed to appear. He was also found guilty of contempt of the Supreme Court of the District because of that failure.

The issuance and service of the subpœnas and the proceedings in each contempt case were under the provisions of the Act of July 3, 1926 (c. 762, 44 Stat. 835, U. S. C., Sup. IV, tit. 28, §§ 711–718 [28 USCA §§ 711–718]).

Section 1 of that act provides that whenever letters rogatory shall issue out of any court of the United States, addressed to any court of any foreign country, to take the testimony of any witness, he being a citizen of the United States or domiciled therein, and such witness, having been personally notified, neglects to appear, the court out of which such letters issued may authorize the issu-

ance of a subpœna addressed to any consul of the United States within any country in which such witness may be, commanding such witness to appear before the court at a time and place therein designated.

The remaining sections read as follows:

"Sec. 2. Whenever the attendance at the trial of any criminal action of a witness, being a citizen of the United States or domiciled therein, who is beyond the jurisdiction of the United States, is desired by the Attorney General or any assistant or district attorney acting under him, the judge of the court before which such action is pending, or who is to sit in the trial of the same, may, upon proper showing, order that a subpœna issue, addressed to any consul of the United States within any country in which such witness may be, commanding such witness to appear before the said court at a time and place therein designated.

"Sec. 3. It shall be the duty of any consul of the United States within any country in which such witness may be at the request of the clerk of the court issuing any subpœna under this Act or at the request of the officer causing such subpœna to be issued, to serve the same personally upon such witness and also to serve any orders to show cause, rules, judgments, or decrees when requested by the court or United States Marshal, and to make a return thereof to the court out of which the same issued, first tendering to the witness the amount of his necessary expenses in traveling to and from the place at which the court sits and his attendance thereon, which amount shall be determined by the judge on issuing the order for the subpœna and supplied to the consul making the service.

"Sec. 4. If the witness so served shall neglect or refuse to appear as in such subpœna directed, the court out of which it was issued shall, upon proof being made of the service and default, issue an order directing the witness to appear before the court at a time in such order designated to show cause why he should not be adjudged guilty of contempt and be punished accordingly.

"Sec. 5. Upon issuing such order the court may, upon the giving of security for any damages which the recusing witness may have suffered, should the charge be dismissed (except that no security shall be required of the United States), direct as a part of such order that the property of the recusing witness, at any place within the United States, or so much thereof in value as the court may direct shall be levied upon and seized by the marshal of said court in the manner provided

by law or the rule of the court for a levy or seizure under execution, to be held to satisfy any judgment that may be rendered against such witness in the proceeding so instituted.

"Sec. 6. The marshal, having made such levy, shall thereupon forward to the consul of any country where the recusing witness may be a copy of the order to show cause why such witness should not be adjudged guilty of contempt with the request that said consul make service of the same personally upon the recusing witness, and shall cause to be published such order to show cause and for the sequestration of the property of such witness, in some newspaper of general circulation in the district within which the court issuing such order sits, once each week for six consecutive weeks.

"Sec. 7. On the return day of such order or any later day to which the hearing may by the court be continued, proof shall be taken; and if the charge of recusancy against the witness shall be sustained, the court shall adjudge him guilty of contempt and, notwithstanding any limitation upon the power of the court generally to punish for contempt, impose upon him a fine not exceeding $100,-000 and direct that the amount thereof, with the costs of the proceeding, be satisfied, unless paid, by a sale of the property of the witness so seized or levied upon, such sale to be conducted upon the notice required and in the manner provided for sales upon execution.

"Sec. 8. Any judgment rendered pursuant to this Act upon service by publication only may be opened for answer within the time and in the manner provided in section 57 of the Judicial Code."

On May 13, 1925, in the court below, Sinclair and Fall were indicted for conspiracy to defraud the United States. On May 13, 1927, counsel for the United States filed in that court a petition stating that at the trial of the case they desired the attendance of appellant and another; that appellant was a citizen of and then beyond the jurisdiction of the United States; "that your petitioners believe and therefore aver that the attendance of the said persons at the trial of the said cause is vital and important to the United States, because as your petitioners aver, they believe that the said witnesses have knowledge and information with regard to certain important facts which the United States desires to prove in the said cause, and that their testimony as to said facts will be material in connection with the establishment not only of the conspiracy

charged between the defendants in the above captioned cause, but in connection with the proof of overt acts done by the defendants pursuant to said conspiracy. More particularly your petitioners believe and therefore aver that the said * * * and H. M. Blackmer can testify to facts concerning the persons who were in the latter part of the year 1921 and during the year 1922 stockholders of the Continental Trading Company, Ltd., a corporation, and with regard to the distribution by that corporation to its stockholders of certain United States 3½ Liberty Loan bonds as dividends, certain of which bonds, as your petitioners believe and therefore aver, were subsequently delivered by or on behalf of one of the defendants, Harry F. Sinclair, to the other defendant, Albert B. Fall."

The petition further prayed the issuance of a subpœna addressed to any consul general or consul of the United States within the republic of France, or within any country in which either of the witnesses might be, "commanding such witness to appear before this Court in Criminal Court No. 2, at the City of Washington, D. C., on the 17th day of October, 1927."

This petition was duly verified by Owen J. Roberts, Special Assistant to the Attorney General, and now an Associate Justice of the Supreme Court of the United States. On the same day the court ordered the subpœna to issue, and fixed and determined at $500 the amount to be tendered to each witness "for his necessary expenses in traveling to and from Washington, D. C., and for his attendance at Court." Thereupon a subpœna in regular form was issued, and on May 27, 1927, was served on appellant by George Orr, consul of the United States at Paris, France; the consul's return reciting that the service was "at the usual residence of the witness, * * * 25 Avenue Montaigue, Paris, France, and in the presence of Consul Raymond Davis and Mr. Henri Gadd, Attorney for the witness. The witness declined to accept the sum of $500 in United States currency tendered him for traveling expenses. The original copy hereof was left in the hands of the witness." On June 7, 1927, another such subpœna was served on appellant by Raymond Davis, consul of the United States at Paris, who tendered appellant "the sum of $500 currency of the United States of America," which tender likewise was refused.

On November 4, 1927, counsel for the United States presented a petition to the court below for a rule in contempt, setting forth in detail the proceedings culminating in the failure of appellant to appear as a witness. In addition to the order to show cause, it was prayed that the court direct that the property of appellant within the United States of the amount and value of $100,000, or such other amount and value as to the court might seem proper, be levied upon and seized by the marshal of the court "and held to satisfy any judgment that may be rendered against the said H. M. Blackmer in this proceeding."

On November 16, 1927, the court, on consideration of the foregoing petition, issued an order directing appellant to appear before the court on January 6, 1928, to show cause why he should not be adjudged guilty of contempt and punished accordingly, and that the property of appellant to the amount and value of $100,000 be levied upon and seized by the marshal to satisfy any judgment that might be rendered against appellant in the proceeding. The order directed that the marshal of the court making the levy forward to the consuls of the United States at Paris, France, or in any other countries where appellant might be, a copy of the order, with the request that such consul or consuls make service of the same personally upon appellant; and, further, that the marshal should cause the order to be published in the Washington Evening Star once each week for six consecutive weeks, "in accordance with the provisions of Section 6, c. 762, of the Act approved July 3, 1926, 44 Stat. 835."

The marshal made return that he had executed the order by levying upon and seizing $100,000 in United States First Liberty Loan bonds at the par value of $100,000; the property of appellant; and George Orr, consul of the United States at Paris, France, made return that on the 5th day of December, 1927, he had "served a true copy of the within order on the within-named Harry M. Blackmer by delivering said true copy to him." After the levy there was a publication once a week for six consecutive weeks in the Washington Evening Star.

In No. 5132 the verified petition for the issuance of a subpœna was filed on January 9, 1928. The court directed the subpœna to issue, commanding appellant to appear on April 2, 1928. The subpœna issued and was served by Consul Orr on the 1st of February, 1928. $500 in currency was again tendered appellant, and was again refused.

On July 6, 1928, counsel for the United States filed a petition for a rule to show cause, setting forth the proceedings culminating in appellant's failure to respond to the

subpœna. An order to show cause was issued but was not served. On December 26, 1928, an alias order was issued commanding appellant to show cause, if any he had, why he should not be adjudged guilty of contempt of court for failing and refusing to obey the subpœna theretofore issued in the case of United States v. Sinclair and Fall. The order further directed the marshal of the District to make a further levy upon property of appellant in the United States to the value of $100,000. The marshal levied upon the same property which he had seized in the prior contempt proceeding. The order was served upon appellant personally by Consul Orr on the 21st of January, 1929, at Paris, France. After the levy there was a publication once a week for six consecutive weeks in the Washington Evening Star.

In each case counsel for appellant appeared specially and moved to vacate the order to show cause and proceedings thereunder, alleging the same to be in conflict with the Fourth, Fifth, Sixth, and Eighth Amendments to the Constitution. The motions were overruled. Whereupon, pleas were filed, on which the United States joined issue or demurred. The cases were heard together, and a fine of $30,000, and costs, adjudged in each case, to be satisfied out of the property seized, unless otherwise paid.

 Counsel for appellant, both in brief and argument, have displayed a wealth of learning and great industry in the presentation of their very numerous contentions, but, in our view, the controlling question is whether it is constitutional for Congress to authorize the service of a subpœna upon a citizen of the United States residing abroad. In determining this fundamental question, we should construe the statute, "if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score." United States v. Jin Fuey Moy, 241 U. S. 394, 401, 36 S. Ct. 658, 659, 60 L. Ed. 1061; Baender v. Barnett, 255 U. S. 224, 226, 41 S. Ct. 271, 65 L. Ed. 597; Panama R. R. Co. v. Johnson, 264 U. S. 375, 390, 44 S. Ct. 391, 68 L. Ed. 748; Michaelson v. United States, 266 U. S. 42, 64, 45 S. Ct. 18, 69 L. Ed. 162, 35 A. L. R. 451. In the Sinking Fund Cases, 99 U. S. 700, 718, 25 L. Ed. 496, the court said: "Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt. One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree

on a strict observance of this salutary rule." Again, in Atkin v. Kansas, 191 U. S. 207, 223, 24 S. Ct. 124, 128, 48 L. Ed. 148, the court said: "We are reminded by counsel that it is the solemn duty of the courts in cases before them to guard the constitutional rights of the citizen against merely arbitrary power. That is unquestionably true. But it is equally true—indeed, the public interests imperatively demand—that legislative enactments should be recognized and enforced by the courts as embodying the will of the people, unless they are plainly and palpably, beyond all question, in violation of the fundamental law of the Constitution."

That the citizen, wherever he may be, and so long as he sustains that relationship, owes an absolute and permanent allegiance to his government, may not be denied. Carlisle v. United States, 16 Wall. 147, 154, 21 L. Ed. 426. He is entitled to the protection of his government, and in return the government is entitled to his unqualified allegiance. Minor v. Happersett, 21 Wall. 162, 166, 22 L. Ed. 627; Luria v. United States, 231 U. S. 9, 22, 34 S. Ct. 10, 58 L. Ed. 101.

In Rose v. Himely, 4 Cranch, 241, 279, 2 L. Ed. 608, Mr. Chief Justice Marshall said: "It is conceded that the legislation of every country is territorial; that beyond its own territory it can only affect its own subjects or citizens." In The Apollon, 9 Wheat. 362, 370, 6 L. Ed. 111, the court, speaking through Mr. Justice Story, said: "The laws of no nation can justly extend beyond its own territories, except so far as regards its own citizens. They can have no force to control the sovereignty or rights of any other nation, within its own jurisdiction."

In United States v. Bowman, 260 U. S. 94, 43 S. Ct. 39, 67 L. Ed. 149, it was held that a criminal statute, dealing with acts that are directly injurious to the government and capable of perpetration without regard to particular locality, is to be construed as applicable to citizens of the United States upon the high seas or in a foreign country, though there be no express declaration to that effect; that citizens of the United States while in a foreign country are subject to penal laws passed by the United States to protect itself and its property. In United States v. Bennett, 232 U. S. 299, 34 S. Ct. 433, 58 L. Ed. 612, it was held that the government of the United States as a nation by its very nature benefits the citizen and his property wherever found, and that no imaginary barrier shuts that government off from exerting the powers which inherently belong to it by vir-

tue of its sovereignty. In Cook v. Tait, 265 U. S. 47, 44 S. Ct. 444, 68 L. Ed. 895, it was ruled that Congress has power to tax income received by a citizen of the United States domiciled abroad from property situated abroad.

In Bartue and Duchess of Suffolk's Case, 2 Dyer's Rep. 176.b, 73 Eng. Reprint 388, and in Knowles v. Luce, Moore's Rep. (K. B.) 109, 72 Eng. Reprint 473, it was held that at common law the sovereign has a right to recall the subject or citizen from abroad and may seize and forfeit all his property if he refuses to return.

We think it logically follows from the foregoing authorities that a citizen of the United States, though residing abroad, is nevertheless amenable to process issuing under a statute requiring him to appear as a witness in a court of the United States, and that, if he receives reasonable notice and reasonable traveling and attendance fees, due process is satisfied. It is inconceivable that a citizen witness may clog the wheels of justice by crossing the international border, and that the government should be powerless to summon him to return and to subject him to a penalty if, without cause, he fails to respond to the summons.

The act of 1926 makes it the duty of a citizen, residing abroad, to return when wanted as a witness, and prescribes the notice to be served upon him. In serving that notice the consul exercises no sovereign power. His notice is informative and not coercive. Mr. Chief Justice Taft, speaking for the court in United States v. Bowman, 260 U. S. 94, 102, 43 S. Ct. 39, 42, 67 L. Ed. 149, said: "Clearly it is no offense to the dignity or right of sovereignty of Brazil to hold them for this crime against the government [of the United States] to which they owe allegiance." So here, it is no offense to the dignity or right of sovereignty of France merely to notify an American citizen residing therein that he is wanted as a witness in a court of the United States. The consul who served the subpœna was not acting in his consular or diplomatic character, but as a mere messenger of the government of the United States. The act might as well have authorized the court to designate a messenger to serve the notice. Moreover, the record discloses no complaint on the part of France.

But appellant contends that the act does not provide any valid method of acquiring jurisdiction to render a personal judgment against the defendant and his property; hence that all proceedings authorized by the act leading to the judgment against person and property, and all subsequent proceedings, are void as lacking due process.

Contempt proceedings "are sui generis—neither civil actions nor prosecutions for offenses, within the ordinary meaning of those terms—and exertions of the power inherent in all courts to enforce obedience, something they must possess in order properly to perform their functions. * * * While contempt may be an offense against the law and subject to appropriate punishment, certain it is that since the foundation of our government proceedings to punish such offenses have been regarded as sui generis and not 'criminal prosecutions' within the Sixth Amendment or common understanding." Myers v. United States, 264 U. S. 95, 103, 104, 44 S. Ct. 272, 273, 68 L. Ed. 577.

In Ex parte Grossman, 267 U. S. 87, 117, 45 S. Ct. 332, 336, 69 L. Ed. 527, 38 A. L. R. 131, the court said: "Contempt proceedings are sui generis because they are not hedged about with all the safeguards provided in the bill of rights for protecting one accused of ordinary crime from the danger of unjust conviction."

In Cooke v. United States, 267 U. S. 517, 45 S. Ct. 390, 69 L. Ed. 767, the court reaffirmed the ruling in Ex parte Terry, 128 U. S. 289, 9 S. Ct. 77, 32 L. Ed. 405, that, when a contempt is committed in open court, it may be adjudged and punished summarily upon the court's own knowledge of the facts, without further proof, without issue or trial, and without hearing an explanation of the motives of the offender. The court then said (page 536 of 267 U. S., 45 S. Ct. 390, 395): "When the contempt is not in open court, however, there is no such right or reason in dispensing with the necessity of charges and the opportunity of the accused to present his defense by witnesses and argument. The exact form of the procedure in the prosecution of such contempts is not important. * * * Due process of law, therefore, in the prosecution of contempt, except of that committed in open court, requires that the accused should be advised of the charges and have a reasonable opportunity to meet them by way of defense or explanation."

In the present case, proof was made that appellant did not respond to either of the subpœnas. Thereupon the court, in each case, issued an order directing appellant to appear at a fixed time to show cause why he should not be adjudged guilty of contempt and punished accordingly; and the order in each case also directed that the property of

appellant "within the United States, of the amount and value of $100,000, be levied upon and seized by the Marshal of this Court *and held to satisfy any judgment that may be rendered* against the said Harry M. Blackmer in this proceeding." (Italics ours).

In No. 5131 the order to show cause did not set forth the basis of the order. In No. 5132 appellant was specifically informed that he should show cause why he should not be adjudged guilty of contempt in neglecting, failing, and refusing to obey the subpœna, theretofore issued by the court and served upon him, to appear before the court as a witness in the case of United States v. Harry F. Sinclair and Albert B. Fall. In the circumstances of this case we do not think appellant is in a position to complain because the charge in No. 5131 was not more specific. To determine whether a defendant has been sufficiently informed of the charges against him, the reviewing court may examine the entire record. Schwartz v. United States (C. C. A.) 217 F. 866. Mr. Blackmer is a lawyer, was represented by counsel throughout, and the record leaves no room for doubt that he fully understood that the rule to show cause in each case was based upon his failure to respond to the subpœnas.

Moreover, at the trial of the contempt cases, evidence was introduced by counsel for appellant in supposed extenuation of the offense in each case and in mitigation of penalty. This amounted to a general appearance, and appellant will not now be permitted to challenge the sufficiency of the rules to show cause.

■ In each instance property of the value of $100,000 was attached to satisfy any judgment that might be rendered against appellant. As provided by section 5 of the act, appellant received personal notice in each instance, and in each instance there was service by publication as required by section 6 of the act. In each instance, the charge of recusancy against him having been sustained, the court, as required by section 7 of the act, adjudged him guilty of contempt and imposed the only penalty provided by that section, namely, a fine of not exceeding $100,000—to wit, $30,000 in each instance. These judgments were to be fully satisfied out of the property attached. It is, we think, plain that there has been no attempt in these cases to obtain a judgment in personam to be enforced in any other court than the court below or in any other respect than upon the property under the control of that court. The proceedings were quasi in rem, in which

class of cases a judgment binds nothing but the property attached. Cooper v. Reynolds, 10 Wall. 308, 19 L. Ed. 931; Pennoyer v. Neff, 95 U. S. 714, 730, 24 L. Ed. 565. The fact that Congress theretofore had not authorized such a procedure does not militate against the existence of the power to do so. In Big Vein Coal Co. v. Read, 229 U. S. 31, 33 S. Ct. 694, 696, 57 L. Ed. 1053, it was ruled that a Circuit Court of the United States has no jurisdiction to issue an order of attachment in a case where no personal service can be had upon the defendant and where there has been no personal appearance in the action, but the court was careful to say: "If Congress had intended any such radical change, it would have been easy to have made provision for that purpose, and doubtless a method of service by publication in such cases would have been provided."

It is not necessary, therefore, to determine whether section 4 of the act authorizes a personal judgment in the absence of the recusing witness, nor whether the prescribed procedure would constitute due process. We are convinced that Congress would have authorized the procedure under section 5, irrespective of section 4. Pollock v. Farmers' Loan & Trust Co., 158 U. S. 601, 635, 636, 15 S. Ct. 912, 39 L. Ed. 1108; El Paso & N. E. Ry. v. Gutierrez, 215 U. S. 87, 96, 30 S. Ct. 21, 54 L. Ed. 106; Southwestern Oil Co. v. Texas, 217 U. S. 114, 121, 30 S. Ct. 496, 54 L. Ed. 688.

■ Appellant advances the contention that the search and seizure of property authorized by the act is unreasonable and violative of the Fourth Amendment. Reasonably construed, the act does not contemplate or authorize an unreasonable search and seizure, and the records in these cases fail to disclose such a search and seizure. The marshal's return in each case recites that he executed the order of the court "by levying upon and seizing One Hundred Thousand ($100,000) Dollars in United States First Liberty Loan Bonds at the par value of $100,000, the property of the said defendant, Harry M. Blackmer."

■ It further is contended that "by excluding defendants in criminal prosecutions from the right to extra-territorial subpœnas the Act violates that part of the Sixth Amendment of the United States Constitution providing that the accused in such actions shall have compulsory process for obtaining witnesses in his favor."

Section 1 of the act (28 USCA § 711) provides that, if a citizen of the United States while abroad refuses to respond to letters

rogatory, the court out of which such letters issued may authorize the issuance of a subpœna for such citizen to appear before the court at the time and place designated. This section is available to either party in a civil action and to the defendant in a criminal action or in a contempt proceeding. Because of the provisions of the Sixth Amendment that the accused is entitled to be confronted with the witnesses against him, the United States is not entitled to letters rogatory in a criminal case. The defendant in such a case may have such letters, and, if the witness refuses to respond, may have a subpœna. He has, therefore, substantially equal process to that accorded the United States. This is all that is required. · In United States v. Heinze, 218 U. S. 532, 31 S. Ct. 98, 54 L. Ed. 1139, 21 Ann. Cas. 884, ·the ·contention was advanced that the defendant in a criminal case was denied due process and equal protection of the law because he was not accorded rights to appeal equal to those accorded the prosecution. The contention was rejected.

In Blair v. United States, 250 U. S. 273, 39 S. Ct. 468, 471, 63 L. Ed. 979, the plaintiffs in error had been adjudged guilty of contempt because of their refusal to obey a court order directing them to answer certain questions before a federal grand jury, and committed to the custody of the marshal until they should comply. On their refusal to answer the questions, the grand jury made a written presentment of the facts ·to the District Court, with the prayer that they might be dealt with as contumacious witnesses. Counsel for the witnesses contended that the Corrupt Practices Act of June 25, 1910 (36 Stat. 822), was unconstitutional and void, and hence that the grand jury lacked authority to investigate supposed violations of that act. In affirming the judgment, Mr. Justice Pitney for the Supreme Court said: "In truth it is in the ordinary case no concern of one summoned as a witness whether the offense is within the jurisdiction of the court or not." So here, it was the duty of appellant to respond to the summons, and it was not his function but that of the defendants in the criminal case to challenge the validity of the proceedings.

█ It is further contended that the act violates the guarantee of due process under the Fifth Amendment "because it is arbitrary, .capricious, unreasonable, indefinite and uncertain"; first, because it makes "ownership of 'nonoffending' property condition precedent to guilt of a criminal offense." Section 5 (28 USCA § 715) as we have already ruled,

authorizes the quasi in rem proceeding whenever property of the recusing witness may be attached, but the contumacy of the witness depends, not upon the ownership of property, but upon the question whether he, without cause, failed to respond to the witness subpœna. Knowing that so long as the recusing witness remained abroad he could not be subjected to punishment, except through a fine levied upon his property located here, we think the provision was within the power of classification of Congress. As the court below observed: "The provision of the statute for the sequestration of the property of such a witness within the territorial jurisdiction of the United States is analogous to the sequestration of property, not infrequently made, of a party litigant who otherwise, by the simple expedient of remaining out of the territorial jurisdiction of the court, may defeat the purposes of a suit or action."

Section 5 of the act authorized the court to direct: "That the property of the recusing witness, at any place within the United States, or so much thereof in ·value as the court may direct shall be levied upon and seized * * * to be held to satisfy any judgment that may be rendered against such witness in the proceeding so instituted." Under section 7 (28 USCA § 717), the limit of the fine is $100,000. It must be assumed, therefore, that the court, in the exercise of a reasonable discretion, would not direct the attachment of more property than necessary to liquidate the authorized fine. The circumstances of each case also would be an element in the determination by the court of the amount of· the property to be attached.

Since personal service was had .in the present cases, it is unnecessary to consider section 8 (28 USCA § 718).

█ Appellant further contends that the subpœnas directed to him were not issued upon proper showing, and hence violative of due process under the Fifth Amendment. Section 1 of the act (28 USCA § 711) authorizes the court to issue a subpœna "upon proper showing" in cases where a witness has neglected to respond to letters rogatory. Section 2 (28 USCA § 712) provides that whenever the attendance, at the trial of any criminal action, of a witness who is beyond the jurisdiction of the United States, "is desired by the Attorney General or any assistant or district attorney acting under him, the judge of the court before which such action is pending, or who is to sit in the trial of the same, may, upon proper showing, order that a subpœna issue. * * *" It may be observed at the

outset that it is for the court, in the exercise of a sound discretion, to determine whether a proper showing has been made, and not the recusing witness. That a proper showing was made in the present case is, we think, too plain to admit of doubt.

The act of 1926 contains no requirement that the subpœna contain notice that it was issued under authority of the act. It is to be presumed, therefore, that the ordinary form of subpœna was to be issued. Moreover, the records in these cases disclose that appellant had advised with counsel and was thoroughly familiar with the provisions of the act. He not only was chargeable with knowledge of the act, but was possessed of actual knowledge of the act.

Appellant further contends that "the tenders of witness fees were insufficient and appellant was not bound to obey the subpœnas." In each instance the court, in conformity with the statute, fixed the amount to be tendered to appellant "for his necessary expenses in travelling to and from Washington, D. C., and for his attendance at Court," at $500. In serving the first subpœna, Consul Orr tendered the $500 "for travelling expenses"; but in serving the second subpœna for attendance at the same trial, Consul Davis simply tendered $500; and Consul Orr in serving the subpœna in No. 5132 tendered $500 without any limitation. Appellant in each instance, so far as the records disclose, refused each tender without asking any questions and without any protest. There is no evidence that the amounts of the tenders were insufficient. If appellant did not understand what they were for, he was lacking in intelligence. Being a lawyer and actually familiar with the provisions of the act, it will be presumed that he knew the purpose and scope of the tenders.

The contention is made that there was an abandonment of the seizure in No. 5131 by the seizure of the same property in No. 5132, and authorities cited to the effect that, if in a particular action an alias order is issued before property taken under the original writ is disposed of, the alias order destroys the lien acquired by the original writ. These cases are not in point, for here there were two different seizures in two different cases upon two different causes of action. The two different levies in these cases are not inconsistent with an intent on the part of the government to maintain each.

In No. 5132 appellant was subpœnaed to appear on April 2, 1928, "and not depart the court without leave of the court or district attorney." The trial was continued and did not commence until April 9, 1928, when appellant was called as a witness and did not respond. He now contends that he was not subpœnaed to attend the court on April 9, 1928, and, hence, that all proceedings in No. 5132 under his alleged neglect and refusal to appear as a witness are null and void. The record shows that the Sinclair-Fall case was set for retrial on April 2, 1928. For cause shown, the trial court extended the time for commencement to April 4 and again until April 9, 1928. Had appellant obeyed the subpœna and presented himself on April 2, 1928, as required, he would have learned of the continuance and would not have been given leave to depart by either the court or the district attorney. As the court below observed: "What happened on April 2nd in the way of continuing the hearing until a later date was none of his concern."

Finally, appellant contends that "the fines adjudged in these cases, totalling the sum of $60,000 ($30,000 in each case) are so grossly excessive as to amount to deprivation of property without the due process of law guaranteed by the Fifth Amendment."

When appellant was called as a witness on October 17, 1927, his counsel appeared and attempted to explain why he was not present. In their brief they state that it was desired to give assurance that appellant had no contempt for the court, nor for the judge thereof, nor for the valid laws of the United States; that appellant, in good faith, believed and had been advised that the law and procedure thereunder violated his constitutional rights as a citizen.

In support of appellant's motions to vacate the orders to show cause, his counsel filed appellant's affidavit, in which appellant stated: "That in the year 1924 he left the City of Denver, State of Colorado, United States of America, resigning his position as Chairman of the Board of Directors of the Midwest Refining Company, and retired from business, taking up his residence at Hotel Plaza Athenee, in the City of Paris, France (although retaining his American citizenship); that thereafter and in the year 1926 he formed the intention of residing permanently abroad and then disposed of his former home in the said City of Denver, since which time he has at all times resided abroad, spending his time in England, in France and elsewhere."

At the trial of the contempt cases, George Gordon Battle, Esquire, of New York City, and Eugene D. Millikin, Esquire, of Denver,

Colo., appeared as counsel for appellant. During the course of the trial, Mr. Battle was called as a witness on behalf of the defendant (appellant here). He testified that he was in Paris, France, in the summer of 1927, just after the subpœnas had been served on Mr. Blackmer (dates of service: May 27, 1927, and June 7, 1927), and discussed with him the constitutionality and procedure under the Walsh Act (Act of July 3, 1926, 44 Stat. 835 [28 USCA §§ 711–718]) and as to what his action should be with respect to responding to the subpœna; that the witness informed Blackmer that he (the witness) had carefully considered the question of the constitutionality of the act and had obtained the opinions of several prominent lawyers concerning it; that he "advised Mr. Blackmer that the Act was unconstitutional, that it was void, and that the whole proceedings under it would be void." On cross-examination, the witness stated that he was Blackmer's counsel "considerably before this subpœna went out. I knew that letters rogatory were issued to take his testimony in the suit in Wyoming." Over objection of counsel for appellant, the witness was questioned concerning the suit of United States v. Mammoth Oil Co. (D. C.) 5 F.(2d) 330; Id. (C. C. A.) 14 F.(2d) 705; Id., 275 U. S. 13, 48 S. Ct. 1, 72 L. Ed. 137, in which the United States was seeking civil remedy on the same question on which it sought criminal remedy in the conspiracy case in which appellant was subpœnaed. Mr. Battle testified: "As Mr. Blackmer's counsel I am familiar with the fact that in the bill of the Mammoth Oil Company Case, Mr. Sinclair was charged amongst other things, with conspiracy with Mr. Fall, as in the criminal cases; that there was an application made to the United States District Judge at Cheyenne to take the testimony of Mr. Blackmer on the issues, amongst others, of conspiracy to defraud the United States; that letters rogatory were issued by Judge Kennedy, of that court, addressed to a French Court to examine Mr. Blackmer before them on certain questions propounded by the Government touching this alleged conspiracy"; that, when letters rogatory were exposed to appellant and the questions propounded to him by the French judge of the French court, he (appellant) answered to his name, gave his age, and refused to answer any further questions. The witness was asked whether appellant then knew of the provisions of the act, and he replied, "I told him the provisions of the Act." The witness further testified: "I would also say in regard to the letters rogatory that Mr. Blackmer depended upon the opinion of French counsel that he was not under any obligation to answer the questions addressed to him in the French court."

The purpose of the testimony of Mr. Battle that appellant was advised by eminent counsel that the act was unconstitutional was in supposed extenuation of the offense and in mitigation of the penalty. Sinclair v. United States, 279 U. S. 749, 766, 49 S. Ct. 471, 73 L. Ed. 938, 63 A. L. R. 1258. Blackmer's good faith, therefore, was involved. Tornanses v. Melsing (C. C. A.) 106 F. 775. As bearing upon his good faith, his attitude with respect to the letters rogatory in the civil suit was important. It is clearly recognized that the giving of testimony is a public duty. Blair v. United States, 250 U. S. 273, 281, 39 S. Ct. 468, 63 L. Ed. 979.

It is further urged that the failure to respond to the subpœna at the retrial (R., No. 5132) resulted in no inconvenience to the government, because other testimony became available for use at that trial and, hence, that appellant's conduct was not disrespectful to the court. It ill becomes appellant, after he has persistently manifested an intent to evade his public duty and embarrass the government, to say that his conduct was not contemptuous of the court because other evidence was available to the government. The government prevailed in the civil suit, notwithstanding his refusal to testify (Mammoth Oil Co. v. United States, 275 U. S. 13, 48 S. Ct. 1, 72 L. Ed. 137), but it did not prevail in the criminal case. The result might have been different had appellant fulfilled his duty.

Under the provisions of the statute, the court might have fixed the fine at $100,000 in each case. It was fixed at $30,000 in each case. Mr. Blackmer left the United States in 1924, when it must have been apparent to him that his testimony might and probably would be sought by the government in the attempt to uncover the fraud and corruption culminating in the oil and gas lease to the Mammoth Oil Company. Later, letters rogatory were issued, but Blackmer refused to testify and could not be coerced. His hostile attitude and his disinclination to fulfill his public duty became apparent. When his testimony was sought in the criminal case involving substantially the same facts, he refused to respond to the subpœnas, and attempted to justify his conduct by challenging the constitutionality of the act under which the subpœnas were issued. He knew, or should have known, that it was as much his patriotic duty to yield his testimony in the

government's efforts to uncover fraud and punish the guilty as it would be his duty to bear arms in defense of his country. Indeed, the injury to the government resulting from the refusal of a material witness to testify might be infinitely greater than that resulting from his refusal to bear arms, and, yet, the citizen "may be compelled, by force if need be, against his will and without regard to his personal wishes or his pecuniary interests, or even his religious or political convictions, to take his place in the ranks of the army of his country, and risk the chance of being shot down in its defense." Jacobson v. Massachusetts, 197 U. S. 11, 29, 25 S. Ct. 358, 362, 49 L. Ed. 643, 3 Ann. Cas. 765.

Doubtless Congress considered the possible serious consequences which might result from the refusal of a witness to respond to a subpœna when it authorized a penalty of $100,000 for each offense. It had a right to take into consideration that ordinarily only a man of means could afford the luxury of abandoning his business and practically expatriating himself by taking up his residence abroad. A small fine in such circumstances would have no deterrent effect. In the present cases, the records indicate that Mr. Blackmer is a man of extensive business interests and large means. Considering the records as a whole, we are clearly of the view that the trial court in assessing the fines did not abuse its discretion.

Other contentions have not been overlooked, but they have not been found of sufficient merit to warrant discussion.

The judgments are affirmed.

Affirmed.