**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Meyer LANSKY, Defendant-
Appellant.**

**No. 73-2536.**

United States Court of Appeals,
Fifth Circuit.

June 28, 1974.

Rehearing and Rehearing En Banc
Denied Oct. 8, 1974.

E. David Rosen, Miami, Fla., for defendant-appellant.

Robert W. Rust, U. S. Atty., Miami, Fla., Peter M. Shannon, Jr., Dougald D. McMillan, Cr.Div., App. Section Dept. of Justice, Washington, D. C., Gary Betz, Dept. of Justice Cr. Div., Miami Strike Force, Miami, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, and AINSWORTH and MORGAN, Circuit Judges.

AINSWORTH, Circuit Judge:

Meyer Lansky, an American citizen, was subpoenaed while residing in Israel to return to the United States and testify before a federal grand jury in Miami. The subpoena was issued under the provisions of 28 U.S.C. § 1783,[1] the Walsh

---

1. 28 U.S.C. § 1783:

§ 1783.  Subpoena of person in foreign country

(a) A court of the United States may order the issuance of a subpoena requiring

the appearance as a witness before it, or before a person or body designated by it, of a national or resident of the United States who is in a foreign country, or requiring the production of a specified docu-

Act, which governs the issuance of a subpoena on an American national who is in a foreign country. Lansky did not appear before the grand jury at the designated time, and was subsequently indicted for criminal contempt, in violation of 18 U.S.C. § 401.[2] He was convicted after a jury trial and sentenced to imprisonment of one year and a day. Lansky has appealed, contending that his conviction for criminal contempt was invalid. We reverse.

During 1970 and 1971, a federal grand jury in Miami was investigating concealment and distribution of income of the Flamingo Hotel, Las Vegas, in connection with possible violations of federal income tax laws. The grand jury determined that the testimony of Meyer Lansky was necessary to its investigation, and sought to obtain his appearance. On February 19, 1971, the Government applied to the district court for the issuance of a subpoena for Lansky under 28 U.S.C. § 1783, the Walsh Act, which provides for issuance and service of subpoenas on America citizens abroad. The Government's application was supported by an affidavit of Robert S. Thaller, who stated that he was a Special Attorney for the Justice Department, Organized Crime and Racketeering Section, and was assisting the grand jury in Miami in investigating income tax violations by the concealment of casino income of the Flamingo Hotel during the years 1960–1967. He stated that the investigation had revealed evidence that Lansky was a participant in the scheme to conceal and distribute income of the Flamingo Hotel; that he believed that Lansky was a necessary witness before the grand jury; that it was important that Lansky not have advance warning of the subpoena; and that it was important that other subjects under investigation not know that the Government thought that Lansky could identify them. Thaller further stated that Lansky had resided in Florida until mid-1970, when he went to Israel; that newspapers reported that Lansky had applied for Israeli citizenship. Finally, Thaller stated that air transportation was available between Tel Aviv and Miami and should require no more than four days travel time. Necessary expenses were estimated by affiant.

Based upon this affidavit, District Judge Mehrtens issued a grand jury subpoena pursuant to 28 U.S.C. § 1783 on February 22, 1971. His order commanded Lansky to appear on March 10, 1971, before the United States Grand Jury for the Southern District of Florida at Miami. It directed the United States Consular Officer in Tel Aviv, Israel, to serve the subpoena and a copy of

---

ment or other thing by him, if the court finds that particular testimony or the production of the document or other thing by him is necessary in the interest of justice, and in other than a criminal action or proceeding, if the court finds, in addition, that it is not possible to obtain his testimony in admissible form without his personal appearance or to obtain the production of the document or other thing in any manner.

(b) The subpoena shall designate the time and place for the appearance or for the production of the document or other thing. Service of the subpoena and any order to show cause, rule, judgment, or decree authorized by this section or by section 1784 of this title shall be effected in accordance with the provisions of the Federal Rules of Civil Procedure relating to service of process on a person in a foreign country. The person serving the subpoena shall tender to the person to whom the subpoena is addressed his esti-mated necessary travel and attendance expenses, the amount of which shall be determined by the court and stated in the order directing the issuance of the subpoena. June 25, 1948, c. 646, 62 Stat. 949; Oct. 3, 1964, Pub.L. 88–619, § 10(a), 78 Stat. 997.

2. 18 U.S.C. § 401:
§ 401. Power of court
A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—
(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
(2) Misbehavior of any of its officers in their official transactions;
(3) Disobedience or resistence to its lawful writ, process, order, rule, decree, or command. June 25, 1948, c. 645, 62 Stat. 701.

the order upon Lansky and to tender travel expenses and attendance and subsistence fees as provided by section 1783(b). The Judge finally required that the order, motion for issuance and Thaller's affidavit be sealed.[3]

The subpoena was received by the United States Consul in Tel Aviv on March 2. He attempted to serve the subpoena on Lansky the same day, but Lansky declined to identify himself. Lansky informed the Consul, however, that he would be contacted by an attorney the next day. On March 3, Yoram Alroy, Lansky's attorney, met with the Consul and arranged a meeting with Lansky on March 4, at which time Lansky was served with the subpoena.

Lansky then telephoned his attorney in Miami, Mr. E. David Rosen, and informed him of service of the subpoena. Rosen was engaged in trial on March 4 and 5 (with evening sessions of court), and filed a motion to quash the subpoena on March 8. (There was an intervening weekend, March 6 and 7 being Saturday and Sunday.)

Rosen recited the following in the motion to quash:

That the undersigned counsel was orally informed that the said MEYER LANSKY is physically unable to appear before the Court pursuant to the subpoena; that time does not permit the securing or attaching of a proper medical certificate attesting to the foregoing, but will be presented upon further hearing, if requested or required.

. . . . .

That if directed, MEYER LANSKY will appear before a duly constituted person or body as described in Title 28 United States Code § 1783(a) and be examined under oath in Israel.

A hearing on the motion was held on March 9 before District Judge Atkins. Rosen stated at the hearing that Lansky had told him by telephone that he was physically unable to travel. Rosen also stated that there was not enough time to obtain by mail from Israel the necessary medical certificates pertaining to Lansky's health before March 10 when the subpoena was returnable. He told the court, however, that Lansky would testify under oath before a proper body in Israel without further subpoena. The court questioned whether Lansky's inability to travel could be raised by motion to quash or whether it could only be considered if contempt proceedings followed for failure to appear. Rosen stated that

3. Text of Judge Mehrtens' order:
Upon the affidavit of Robert S. Thaller, Special Attorney, U.S. Department of Justice, sworn to on the 19th day of February, 1971, it is
ORDERED that a subpoena issue, in accordance with the provisions of Section 1783, Title 28, United States Code, as revised, (and Rule 17(e)(2) of the Federal Rules of Criminal Procedure), to the United States Consular Officer in Tel Aviv, Israel commanding Meyer Lansky to appear on the 10th day of March, 1971 before the United States Grand Jury for the Southern District of Florida, Grand Jury Room, United States Courthouse, Miami, Florida, and it is
FURTHER ORDERED that the United States Consular Officer in Tel Aviv, Israel be and he hereby is directed to serve said subpoena and a copy of the order upon Meyer Lansky and upon serving said subpoena tender to Meyer Lansky a Government Travel Request at the lowest Jet Coach rate available for roundtrip between

Tel Aviv, Israel, Miami, Florida and RETURN and $102.00 constituting the amount necessary for travel expenses to and from terminals and for two days' attendance and subsistence. The United States Marshal shall pay $36.00 a day to the witness for each subsequent day of attendance before the United States District Court.
IT IS FURTHER ORDERED that this Order, the Motion for issuance of grand jury subpoena for person in foreign country and the attached affidavit in support of that motion be sealed in an envelope and the envelope be stamped, filed and assigned a miscellaneous file number and that the envelope remain sealed in the custody of the Clerk of the United States District Court, Southern District of Florida, until further order of this Court.
Dated this *22nd* day of February, 1971.
(signed) Wm. O. Mehrtens
UNITED STATES DISTRICT JUDGE

he had brought the motion to quash because he did not "want to place Mr. Lansky in a position of having a contempt proceeding brought against him." Rosen also stated that he would have presented medical certificates if he had had time to obtain them.

At the hearing on the motion Government counsel, Mr. McMillan of the Organized Crime Section of the Department of Justice, stated that in his opinion Lansky left the country because of the investigations surrounding activities of which he had knowledge and some of which he was involved in; that he had sought asylum in Israel where the Government could not reach him. Mr. McMillan stated that Lansky had appeared before a federal grand jury in Miami the previous November and "[t]o all material questions Meyer Lansky invoked the Fifth Amendment, invoked his privilege against self-incrimination under the Fifth Amendment" to Mr. McMillan's examination. In response to the court's question whether it might be assumed if he appeared before the grand jury pursuant to the present subpoena he would likely invoke the Fifth Amendment again, Government counsel conceded that there was this probability but responded that "we do have statutes that deal with recalcitrant witnesses." In the colloquy that ensued the question arose as to whether Lansky would be offered immunity for waiver of his constitutional privilege. Government counsel declined to make any commitment in that regard. Lansky's counsel then argued that it was an exercise in futility "to have this man travel all the way around the world, or half way around, when the Government fully expects him to exercise a constitutional privilege which can be accomplished there."

The district judge, in oral reasons from the bench, denied the motion to quash. He said that Lansky's health reasons for quashing the subpoena, about which his counsel was having difficulty in obtaining full information, "are matters to be brought on by the defense in any contempt proceedings," and "that certainly is something that can be urged upon issuance of a contempt citation if one is issued." At the request of Mr. DeFeo, Government counsel, he directed that Lansky respond to the subpoena on March 11.[4] It was then the

4. The pertinent colloquy between District Judge Atkins and counsel follows (A. 61–64):

THE COURT:

. . . Finally, the health reasons which are implied or at least set forth but admittedly not expressly because of counsel's difficulty in obtaining full information at this stage, are matters to be brought on by the defense in any contempt proceedings.

This morning I think it was clear that communications made it difficult to obtain anything positive in that area, and we are not urging that as a position for quashing the subpoena. If there is anything in that realm, that certainly is something that can be urged upon issuance of a contempt citation if one is issued.

Accordingly, based on these reasons, I will enter an order; in fact, I announce the order now and I will enter a formal order forthwith, but I announce the order now that I am denying the motion to quash the Grand Jury subpoena.

Mr. DeFEO: I am Michael DeFeo on behalf of the Government, your Honor.

Your Honor, because of the shortness of time between the scheduled appearance days of the Grand Jury, we would request that the Court amplify its order to provide that the witness Lansky appear on March 10th or March 11th as soon as travel accommodations permit, or if that be impossible, to the next scheduled dates of the Grand Jury—March 24th or March 25th.

We wish to do this so there will be no necessity to reappear before the Court.

THE COURT: I think I probably have that inherent authority. Are you asking that I pick one of those dates, or that I include it in the order, the alternative?

Mr. DeFEO: That you include the alternative, your Honor.

THE COURT: I will include that as an alternative, that he will appear on the 10th or the 11th or the 24th.

Mr. DeFEO: Your Honor, if I might state one of the reasons for the request is that should Mr. Lansky have health difficulties which Mr. Rosen would like to urge rendering it difficult for him to appear, that we would hope in the interim

afternoon of March 9 and Lansky was in Israel.

Lansky did not appear before the grand jury on March 11. He was indicted by the federal grand jury at Miami on March 24 for criminal contempt in that "having personally received a lawful subpoena of the United States District Court commanding him to appear before the Grand Jury for the Southern District of Florida at Miami on March 10, 1971, and that appearance date having been continued by said Court until March 11, 1971, did knowingly, wilfully and contumaciously disobey and resist said lawful subpoena and order by refusing to appear before said Grand Jury on March 10 and 11, 1971, pursuant to said subpoena and order," all in violation of 18 U.S.C. § 401.

No order to show cause or citation for contempt for failure to appear was ever issued against Lansky.

As we have indicated, Lansky while in Israel was subpoenaed pursuant to 28 U.S.C. § 1783, the Walsh Act. The Act was passed by Congress in 1926 in an attempt to secure the return to the United States of persons involved in the Teapot Dome scandal and its constitutionality was upheld by the Supreme Court in Blackmer v. United States, 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375 (1932).

■ The power of Congress to provide, legislatively, for the service of subpoenas on American citizens outside the United States derives from the fact that "the United States possesses the power inherent in sovereignty to require the return to this country of a citizen, resident elsewhere, whenever the public interest requires it, and to penalize him in case of refusal." Blackmer v. United States, *supra*, 284 U.S. at 437, 52 S.Ct. at 255. This is also the common law tradition as expressed in the D.C. Circuit's opinion in that case:

> In Bartue and Duchess of Suffolk's Case, 2 Dyer's Rep. 176.b, 73 Eng. Reprint 388, and in Knowles v. Luce, Moore's Rep. (K.B.) 109, 72 Eng. Reprint 473, it was held that at common law the sovereign has a right to recall the subject or citizen from abroad and may seize and forfeit all his property if he refuses to return.

Blackmer v. United States, 1931, 60 App.D.C. 141, 49 F.2d 523, 528. The Supreme Court added:

> What in England was the prerogative of the sovereign in this respect pertains under our constitutional system to the national authority which may be exercised by the Congress by virtue of the legislative power to prescribe the duties of the citizens of the United States. It is also beyond controversy that one of the duties which the citizen owes to his government is to support the administration of justice by attending its courts and giving his testimony whenever he is properly summoned. Blair v. United States, 250 U.S. 273, 281, 39 S.Ct. 468, 63 L. Ed. 979. And the Congress may provide for the performance of this duty

---

until March 24th, it would allow him time to seek the necessary medical treatment to enable him to make a trip at least by that time.

Mr. ROSEN: Or in the alternative, to get necessary medical information in order to present it to the Court in furtherance of the motion to quash.

THE COURT: Well, I think we ought to provide for his appearance unless counsel can agree at this point on what date would be more convenient between the two of you.

Mr. DeFEO: We would so request that the date of the 11th be set as the final date.

THE COURT: I will so provide in the order that he shall appear before the jury on the 11th. I assume that transportation facilities can be obtained that would permit his appearance on that date.

Mr. DeFEO: I believe there is a daily flight, your Honor.

THE COURT: Then I would direct that he appear on the 11th, other than the 10th because of the fact that the matter of the motion to quash was not heard until today and the order not entered until this afternoon.

and prescribe penalties for disobedience.

Blackmer v. United States, *supra,* 284 U.S. at 437–438, 52 S.Ct. at 255.

In United States v. Thompson, 2 Cir., 1963, 319 F.2d 665, 667, the Second Circuit commenting on this principle said: "That power must, however, be exercised by Congress, and the district court has no such power or jurisdiction unless expressly conferred by statute."

The next succeeding section of the Walsh Act, codified in 28 U.S.C. § 1784, provides that the court which has issued a subpoena served in a foreign country may order the person who has failed to appear to show cause at a designated time why he should not be punished for contempt; that the court may direct that any of the person's property within the United States be levied upon or seized and held to satisfy any judgment that may be rendered against him pursuant to the section; that a copy of the order to show cause shall be served on the person in the same manner as the original subpoena; and that on the return day of the order to show cause proof shall be taken, and if the person is found in contempt, the court, notwithstanding any limitation upon its power generally to punish for contempt, may fine him not more than $100,000, to be satisfied by a sale of the property levied upon or seized.[5]

Though the Government proceeded under the provisions of section 1783 to subpoena Lansky while in Israel, it did not pursue the provisions of section 1784 relative to contempt for failure to appear in response to such a subpoena and accordingly did not request that the court direct Lansky to show cause before it at a designated time why he should not be punished for contempt. Instead, on March 24, Lansky was indicted under the general contempt statute, 18 U.S.C. § 401.[6]

---

5. 28 U.S.C. § 1784:
   § 1784. Contempt
   (a) The court of the United States which has issued a subpoena served in a foreign country may order the person who has failed to appear or who has failed to produce a document or other thing as directed therein to show cause before it at a designated time why he should not be punished for contempt.
   (b) The court, in the order to show cause, may direct that any of the person's property within the United States be levied upon or seized, in the manner provided by law or court rules governing levy or seizure under execution, and held to satisfy any judgment that may be rendered against him pursuant to subsection (d) of this section if adequate security, in such amount as the court may direct in the order, be given for any damage that he might suffer should he not be found in contempt. Security under this subsection may not be required of the United States.
   (c) A copy of the order to show cause shall be served on the person in accordance with section 1783(b) of this title.
   (d) On the return day of the order to show cause or any later day to which the hearing may be continued, proof shall be taken. If the person is found in contempt, the court, notwithstanding any limitation upon its power generally to punish for contempt, may fine him not more than $100,000 and direct that the fine and costs

of the proceedings be satisfied by a sale of the property levied upon or seized, conducted upon the notice required and in the manner provided for sales upon execution. June 25, 1948, c. 646, 62 Stat. 949; Oct. 3, 1964, Pub.L. 88–619, § 11, 78 Stat. 998.

6. In this connection it is interesting to note what the Supreme Court stated in Blackmer v. United States, *supra,* 284 U.S. at 439–440, 52 S.Ct. at 255–256:
   As the Congress could define the obligation, it could prescribe a penalty to enforce it. And, as the default lay in disobedience to an authorized direction of the court, it constituted a contempt of court, and the Congress could provide for procedure appropriate in contempt cases. The provision of the statute for punishment for contempt is applicable only "upon proof being made of the service and default." Section 4 (28 U.S.C.A. § 714). [28 U.S.C. § 1784] That proof affords a proper basis for the proceeding, and provision is made for personal service upon the witness of the order to show cause why he should not be adjudged guilty. For the same reasons as those which sustain the service of the subpoena abroad, it was competent to provide for the service of the order in like manner. It is only after a hearing pursuant to the order to show cause, and upon proof sustaining the charge, that the court can impose the penalty.

In November 1972 Lansky was expelled from Israel and was arrested in this country on November 7 on the indictment for contempt. He then moved to dismiss the indictment on the ground that 18 U.S.C. § 1784 provides the exclusive procedure and penalty for failure to comply with a subpoena served under 28 U.S.C. § 1783. He urged that sections 1783 and 1784 must be read *in pari materia,* the former section providing the power to subpoena and the latter providing the remedy for disobedience of that power.

The motion to dismiss was denied by the magistrate and on review by the district court. The case proceeded to trial and a jury verdict of guilty was returned against Lansky on February 28, 1973. After the verdict defendant moved for a judgment of acquittal or for a new trial, which was denied.[7] On this appeal Lansky urges two alternative grounds for reversal: 1) that the trial court erred in denying his motion for judgment of acquittal; and 2) that 28 U.S.C. § 1784 provides the exclusive procedure and penalty for failure to comply with a subpoena served under 28 U.S.C. § 1783.

The tests applicable to the consideration of a motion for judgment of acquittal are well expressed in this circuit's opinion in Blachly v. United States, 5 Cir., 1967, 380 F.2d 665, 675, as follows:

In considering the motion for judgment of acquittal, F.R.Crim.P. 29(a), the District Judge must consider the evidence in the light most favorable to the Government, McFarland v. United States, 5 Cir., 1960, 273 F.2d 417; United States v. Carter, 6 Cir., 1963, 311 F.2d 934, together with all inferences which may reasonably be drawn from the facts, Cartwright v. United States, 10 Cir., 1964, 335 F.2d 919. The determining inquiry is whether there is substantial evidence upon which a jury might reasonably base a finding that the accused is guilty beyond a reasonable doubt.

*See also* United States v. Martinez, 5 Cir., 1973, 486 F.2d 15, 23; United States v. Harvey, 5 Cir., 1973, 483 F.2d 448, 450; United States v. Kohlmann, 5 Cir., 1974, 491 F.2d 1250, 1253; United States v. Amato, 5 Cir., 1974, 495 F.2d 545.

■ Applying the above tests to the facts and circumstances here, it is apparent that the Government's case fails for lack of sufficient evidence to establish the guilt of defendant Lansky beyond a reasonable doubt.

Lansky testified at his trial that he had seen his physician, Dr. Dov Peled, on February 28, 1971, in Israel. He said that he desired to return to the United States at that time to ascertain what his tax responsibilities would be if he obtained Israeli citizenship, and also to visit his family. He said that Dr. Peled had advised him that he should not undertake such a trip because of danger to his health. He said that upon receipt of the subpoena on March 4 he telephoned his Miami attorney, Mr. Rosen, and told him the doctor would not permit him to travel because it would be a danger to his health, but that he was willing to give testimony in Israel.

Dr. Peled's deposition was introduced. Dr. Peled testified that he began treating Lansky on October 18, 1970, when he placed him in the hospital at Assuta for four days of examination and he saw that he was suffering from a duodenal ulcer and heart trouble. Lansky gave him a history of myocardial infarction and ulceration of the stomach. Thereafter Dr. Peled continued to treat Lansky. He stated that on February 28, 1971, Lansky came to his office and informed him that he must go to the United States. On that occasion Lansky told the doctor that his condition was worse, that he has more pains in the chest, is disturbed from the stomach, cannot eat,

and is suffering from nausea, heartburn and sleeplessness. Based on his familiarity with Lansky's physical condition, the doctor stated that it was his medical opinion that it would be dangerous to his health for Lansky to make such a trip abroad. He told Lansky, "You can get another heart attack. You can get something." After Lansky was subpoenaed to appear before the grand jury, he asked Dr. Peled for a written statement that the doctor had advised him against travel. Dr. Peled prepared the statement March 15, 1971, and it was introduced at trial. It reads as follows:

> To whom it may concern.
>
> I am hereby to certify, that Mr. LANSKY Meyer, 68 years old, in my treatment since October 1970, is suffering from:
>
> 1) Hypertensive, arteriosclerotic cardiovascular disease.
>
> 2) Duodenal ulcer.
>
> 3) Hypertrophy of prostata.
>
> For these reasons he was hospitalised (sic) in October 70 in the Assuta hospital in Tel-Aviv.
>
> He is still complaining and suffering from vertigo (dizziness), attacks of anginal pain, and pains, related to the duodenal ulcer and difficulty in niction (sic).
>
> He is therefore often confined to bed.
>
> I advised him, to avoid any physical and emotional stress, and not to go on a long far trip abroad.
>
> (original signed) D. Peled.

The Government called a physician, Dr. Edward W. St. Mary of Miami, who testified in rebuttal. Dr. St. Mary said that he made a physical examination of defendant Lansky three days before the trial and found that he had recovered from his old heart attack, but that "[h]e still has a multitude of other problems wrong with him . . . the most important problem right now is arteriosclerotic heart disease, angina pectoris and a minimal degree of congestive heart failure." He considered that the defendant, however, would be able to stand the emotional strain of a trial. He said that he would have conducted further tests before arriving at a diagnosis such as Dr. Peled made in this case. He testified that in his opinion Dr. Peled had insufficient information adequately to diagnose the defendant's cardiac and gastrointestinal conditions. Dr. St. Mary testified that he was not saying that Dr. Peled was wrong in his diagnosis or that Dr. Peled was wrong in advising Mr. Lansky not to travel, but was only saying that according to his standards he would have made more tests before making that determination.[8]

8. It is interesting to note the observation of the trial court in connection with the issue of whether Dr. St. Mary should have been permitted, over objection, to testify. The following excerpt is pertinent thereto (A. 261–262):

THE COURT: . . . If Mr. Lansky is trying to prove here that he does in fact have a heart condition, that's not the question. The question is whether he relied upon the advice given to him by his doctor, who stated to him that he was too ill to travel.

My suggestion to you in this matter is simply this: That to permit the doctor to testify whether or not the facts that Dr. Peled had before him were such for Dr. Peled to render such an opinion, or putting it differently, whether Dr. St. Mary with those same facts would have rendered that opinion. It is misleading to go to the jury, and it's unfair, and I think in all probability would be reversible error. I think what we have to do here is to elicit from the witness whether or not Dr. Peled's medical opinion, which we understand that he gave, he testified he gave it, Mr. Lansky testified he gave it, it is in this record, whether or not that opinion was so far off the mark that medically speaking it amounts to a sham.

Now, that then is a material fact to go to the jury.

Later the court itself propounded a question to Dr. St. Mary as follows (A. 264–265):

THE COURT: Dr. St. Mary, you have read the deposition that was taken of Dr. Peled?

THE WITNESS: Yes, sir.

THE COURT: You understand his background as related in that deposition?

THE WITNESS: Yes, sir.

*Conclusion*

We have carefully detailed the facts and circumstances necessary to a proper determination of whether defendant Lansky "did knowingly, wilfully and contumaciously disobey and resist" the subpoena herein by failing to appear before the grand jury.

Though the subpoena was issued and served under the provisions of the Walsh Act (28 U.S.C. § 1783), the Government concluded not to employ the provisions of that Act (28 U.S.C. § 1784) to punish the defendant for alleged contempt in failing to appear. Thus the defendant was never cited nor was a show cause order issued for contempt. Instead, the Government elected immediately to indict the defendant, who was still in Israel, under the general contempt statute, 18 U.S.C. § 401.

The transcript of the March 9 proceedings before Judge Atkins on the motion to quash shows that the court be-lieved that defendant's counsel, Mr. Rosen, would be able later to present a defense based on Lansky's physical condition, on a proceeding at which the defendant would be cited for contempt. The district court understood that defense counsel could not then present evidence of his client's physical condition since he was several thousand miles away in Israel and there was insufficient time to furnish a medical certificate.

At the Government's request (see n. 4), Judge Atkins required Lansky's appearance before the grand jury in Miami on March 11. No opportunity was afforded defendant to make an appropriate defense at a later time, and only about forty hours remained for the subpoena to be returnable before the grand jury.

The Government knew that in the previous November Lansky had been called before a Miami federal grand jury and

THE COURT: Now, then, would a doctor with Dr. Peled's background and in his field and taking the examination that Dr. Peled made, the history he took, so far as you know him, of this patient, and under those circumstances or similar circumstances, can you say that Dr. Peled's advice to this patient not to travel because it might endanger his life was such poor advice that it would almost amount to a fraud?

THE WITNESS: No, sir, I cannot say that.

THE COURT: Considering what Dr. Peled knew at that time, that is the tests he performed, his educational background and the type of practice that he has as related in that deposition, can you say that there is a doubt in your mind as to whether his advice was given in good faith?

THE WITNESS: No, sir.

THE COURT: A doctor with similar experience and similar background and similar tests at hand might have given the same advice?

THE WITNESS: Yes, sir.

Later, on cross-examination, Dr. St. Mary was asked the following (A. 273–274):

BY MR. ROSEN:

Q Dr. St. Mary, you used an interesting term, "according to our standards." Who is "our standards"?

A I think that's part of the teacher in me. I would say my standards.

Q Have you ever practiced medicine in Israel?

A No, sir.

Q Do you know what type of facilities they have?

A Vaguely, but not enough to be qualified to say so.

Q In other words, what you are saying, sir, is in your judgment—well, let me ask you this: Do you consider yourself as a very conservative doctor?

A Yes, sir.

Q So what you are really saying, then, is that because you are very conservative, you would have taken more tests before coming to such a conclusion?

A That's correct.

Q You would have?

A That's correct.

Q Now, are you saying that Dr. Peled was wrong in his diagnosis?

A No, sir.

Q Are you saying that he was wrong in advising Mr. Lansky not to travel?

A No, sir.

Q You are just saying you would have made more tests before making that determination.

A Yes. I think most of us would have made more tests.

Q Here in this country?

A Yes.

had declined to answer all questions, claiming his Fifth Amendment constitutional privilege. There was no question that Lansky himself was under investigation by the Government for alleged serious criminal offenses. Mr. McMillan, Government counsel, stated as much at the hearing before Judge Atkins, and said that Lansky had fled the country on that account. It is clear that the Government did not expect him to waive his Fifth Amendment claim against self-incrimination should he appear again before a federal grand jury. What information the Government expected to obtain from the defendant in a grand jury appearance is not revealed.

At the trial there was no substantial evidence introduced by the Government which could fairly be said to contradict the defense that there had been no wilful and contumacious disregard of the subpoena. The contention was made that Lansky should have accepted service of the subpoena when originally tendered him in Tel Aviv, and that filing of the motion to quash was unduly delayed. However, under all circumstances the time lapse from March 2 to 9 was fairly accounted for by the defense. Dr. Peled's testimony concerning defendant's physical condition that travel abroad would be dangerous to Lansky's health was impaired only by Government witness, Dr. St. Mary, to the extent that he thought that more tests should have been made by the Israeli doctor before pronouncing his diagnosis. Dr. St. Mary testified, however, that he could not say that Dr. Peled's advice to his patient not to travel because it might endanger his life was such poor advice as to amount to a fraud. Nor could he say that there was a doubt in his mind as to whether the advice was given in good faith. He agreed that a doctor with similar experience and background and tests might have given the same advice. He would not say therefore, that Dr. Peled was wrong in his diagnosis or wrong in advising Mr. Lansky not to travel to the United States. He was only willing to say that he was a very conservative doctor and would have made more tests. Dr. St. Mary also testified that in his examination of the defendant several days before the trial, he found that he was suffering from a "multitude" of physical problems.

We cannot agree, therefore, that the Government has proved beyond a reasonable doubt that the defendant was guilty of wilful and contumacious conduct sufficient to justify a verdict of guilty of contempt. When the Government requested that the court fix March 11 as the return date of the subpoena, it made compliance by the defendant virtually impossible. Though it tried to make out a case of fraud and collusion between Lansky and his doctor it failed in this regard and the circumstances do not support its contentions. Mere suspicion and conjecture are not enough to predicate a guilty verdict. The motion for judgment of acquittal should have been granted because there was insufficient evidence upon which a jury might reasonably find that the accused was guilty beyond a reasonable doubt.[9]

Reversed.

9. In view of our holding, it is unnecessary that we decide appellant's second point of error, namely, that 28 U.S.C. § 1784 provides the exclusive procedure and penalty for failure to comply with a subpoena served under 28 U.S.C. § 1783.