## CARLISLE v. UNITED STATES.

1. Aliens domiciled in the United States in 1862 were engaged in manufacturing saltpetre in Alabama, and in selling that article to the Confederate States, knowing that it was to be used by them in the manufacture of gunpowder for the prosecution of the war of the rebellion; *Held*, that they thus gave aid and comfort to the rebellion.

2. The doctrine of *Hanauer* y. *Doane* (12 Wallace, 342), that "he who, being bound by his allegiance to a government, sells goods to the agent

of an armed combination to overthrow that government, knowing that the purchaser buys them for that treasonable purpose, is himself guilty of treason or a misprision thereof," repeated and affirmed.

3. Aliens domiciled in the United States owe a local and temporary allegiance to the government of the United States; they are bound to obey all the laws of the country, not immediately relating to citizenship, during their residence in it, and are equally amenable with citizens for any infraction of those laws. Those aliens who, being domiciled in the country prior to the rebellion, gave aid and comfort to the rebellion, were, therefore, subject to be prosecuted for violation of the laws of the United States against treason and for giving aid and comfort to the rebellion.

4. The proclamation of the President of the United States, dated December 25th, 1868, granting "unconditionally, and without reservation, to all and to every person who, directly or indirectly, participated in the late insurrection or rebellion, a full pardon and amnesty for the offence of treason against the United States, or of adhering to their enemies during the late civil war, with restoration of all rights, privileges, and immunities under the Constitution and the laws which have been made in pursuance thereof," includes aliens domiciled in the country who gave aid and comfort to the rebellion.

5. The pardon and amnesty thus granted relieve claimants prosecuting in the Court of Claims for the proceeds of captured and abandoned property, under the act of Congress of March 12th, 1863, from the consequences of participation in the rebellion, and the necessity of establishing their loyalty in order to prosecute their claims, which would otherwise be indispensable to a recovery.

6. By the proceeding known as a "petition of right," the government of Great Britain accords to citizens of the United States the right to prosecute claims against that government in its courts, and therefore British subjects, if otherwise entitled, may, under the act of Congress of July 27th, 1868, prosecute claims against the United States in the Court of Claims.

THIS was an appeal from the Court of Claims. The claimants there were subjects of the Queen of Great Britain, but had been residents within the United States prior to the war of the rebellion, and during its continuance. In 1864 they were the owners of sixty-five bales of cotton stored on a plantation in Alabama. This cotton was seized during that year by naval officers of the United States and turned over to an agent of the Treasury Department, by whom the cotton was sold and the proceeds paid into the treasury. The present action was brought in the Court of Claims under the act of Congress of March 12th, 1863, known as

the Captured and Abandoned Property Act, to recover these proceeds.

The court found that the claimants were the owners of the cotton, and that it was seized and sold as stated, and that the net proceeds, amounting to $43,232, were paid into the treasury.

The court also found that the government of Great Britain accords to citizens of the United States the right to prosecute claims against that government in its own courts; but that the claimants were engaged, in 1862, in manufacturing saltpetre in Alabama, and selling that article to the Confederate States, and that they thus gave aid and comfort to the rebellion, and for that reason were not entitled to recover the proceeds of the cotton seized. Their petition was accordingly dismissed. The facts connected with the manufacture and sale of the saltpetre are thus stated by the court in its findings:

"From having, in 1860 and 1861, been engaged in the business of railroad contractors, they began in December, 1861, the manufacture of saltpetre at Santa Cave, Alabama, and continued engaged therein until the following April, when, owing to the presence of United States troops in the vicinity, they left the cave, and remained absent therefrom until the following October, when, immediately after the evacuation of Huntsville, Alabama, by the United States forces, they resumed work in making saltpetre at said cave, and continued it about two months. Their right to make saltpetre there was under a contract of lease between the owners of the cave and other parties, which had been transferred to the claimants, by whom it was, in May, 1863, sold and transferred to the so-called 'Confederate States of America' for $34,600. On the 28th of March, 1862, the claimants sold to the said Confederate States of America 2480 lbs. of saltpetre, at 75 cents per pound, in all $1860, and received payment therefor at Richmond, Virginia, on the 27th of June, 1862, from a rebel captain of artillery; and on the 30th of November, 1862, they sold to the said 'Confederate States' 4209 lbs. of nitre, at 75 cents per pound, in all $3156.75,

and in the bill of the same, which the claimants receipted, it was expressed that the said nitre was 'for manufacture of gunpowder;' and the amount of said bill was paid at Larkinsville, Alabama, on the 24th of December, 1862, by the rebel 'superintendent of nitre and mining district No. 9;' and the claimants hired to the said 'Confederate States' wagons to transport the said nitre from Santa Cave to Rome, Georgia."

From the decree dismissing the petition the claimants appealed to this court.

*Messrs. Carlisle and McPherson, for the appellants; Mr. C. H. Hill, Assistant Attorney-General, contra.*

Mr. Justice FIELD delivered the opinion of the court.

The circumstances attending the manufacture and sale of the saltpetre, as disclosed in the findings of the court, plainly show that the claimants knew that the saltpetre was to be used by the Confederates in the manufacture of gunpowder for the prosecution of the war of the rebellion, and there is little doubt that the sale was made in order to aid the Confederates in accomplishing their treasonable purposes. By thus furnishing materials for the prosecution of the war whilst they were domiciled in the country, knowing the uses to which the materials were to be applied, the claimants became participators in the treason of the Confederates equally as if they had been original conspirators with them. The Court of Claims, therefore, did not err in its conclusion that the act of the claimants in selling the saltpetre to the Confederates, under these circumstances, was an act of aid and comfort to the rebellion. We have already held in *Hanauer* v. *Doane,*[*] and we repeat and reaffirm what we there said, that "he who, being bound by his allegiance to a government, sells goods to the agent of an armed combination to overthrow that government, knowing that the purchaser buys them for that treasonable purpose, is himself guilty of

---

* 12 Wallace, 347.

treason or a misprision thereof.  He voluntarily aids the treason.  He cannot be permitted to stand on the nice metaphysical distinction that, although he knows that the purchaser buys the goods for the purpose of aiding the rebellion, he does not sell them for that purpose.  The consequences of his acts are too serious and enormous to admit of such a plea.  He must be taken to intend the consequences of his own voluntary act."

But the aid and comfort thus given to the rebellion by the claimants did not justify a denial of their right to recover the proceeds of their property in the treasury of the United States after the proclamation of pardon and amnesty made by the President on the 25th of December, 1868, unless their character as aliens excludes them from the benefit of that proclamation, a question which we shall presently consider.  Assuming that they are within the terms of the proclamation, the pardon and amnesty granted relieve them from the legal consequences of their participation in the rebellion, and from the necessity of proving that they had not thus participated, which otherwise would have been indispensable to a recovery.  It is true, the pardon and amnesty do not and cannot alter the actual fact that aid and comfort were given by the claimants, but they forever close the eyes of the court to the perception of that fact as an element in its judgment, no rights of third parties having intervened.

There has been some difference of opinion among the members of the court as to cases covered by the pardon of the President, but there has been none as to the effect and operation of a pardon in cases where it applies.  All have agreed that the pardon not merely releases the offender from the punishment prescribed for the offence, but that it obliterates in legal contemplation the offence itself.

When, therefore, in Padelford's case,* a claimant under the Captured and Abandoned Property Act, who had given aid and comfort to the rebellion, appeared in the Court of Claims, asking for a restoration of the proceeds of his prop-

---

* 9 Wallace, 531.

erty, and showing that he had taken the oath prescribed by the proclamation of President Lincoln, of December 8th, 1863, and had since then kept the oath inviolate, and was thereby by force of the proclamation pardoned, this court held that after the pardon thus granted no offence connected with the rebellion could be imputed to him; that if in other respects he made the proof which under the act entitled him to a decree for the proceeds of his property, the law made the proof of pardon a complete substitute for proof that he had given no aid or comfort to the rebellion; and that a different construction would defeat the manifest intent of the proclamation and of the act of Congress which authorized it.

In Klein's case,* which subsequently came before the court, an act of Congress designed to deny to the pardon of the President the effect and operation which the court had thus adjudged to it, and which declared that an acceptance of pardon without disclaimer should be conclusive evidence of the acts pardoned, and be inoperative as evidence of the rights conferred by it in the Court of Claims and in this court, was held to be unconstitutional and void.

In Mrs. Armstrong's case,† which was here at the last term, the court declined to consider whether the evidence was sufficient to prove that the claimant had given aid and comfort to the rebellion, and held that the proclamation of pardon and amnesty issued by the President on the 25th of December, 1868, entitled her to the proceeds of her captured and abandoned property in the treasury, without proof that she never gave such aid and comfort; that the proclamation granting pardon unconditionally, and without reservation, was a public act of which all courts of the United States were bound to take notice, and to which all courts were bound to give effect.

In Pargoud's case,‡ also here at the last term, the claimant stated in his petition that he was guilty of participating in the rebellion, but that he had been pardoned by the Presi-

---

* 13 Wallace, 128.          † Ib. 154.          ‡ Ib. 156.

dent, by special act, in January, 1866, and also by operation of the President's general proclamation. The Court of Claims decided against the claimant on the ground that his petition did not aver that he had not given any aid or comfort to the rebellion, and did not sufficiently aver a pardon by the President. This court reversed the judgment, following the decision in Mrs. Armstrong's case, and holding that the President's proclamation of December 25th, 1868, relieved claimants of captured and abandoned property from proof of adhesion to the United States during the civil war.

After these repeated adjudications, it must be regarded as settled in this court that the pardon of the President, whether granted by special letters or by general proclamation, relieves claimants of the proceeds of captured and abandoned property from the consequences of participation in the rebellion, and from the necessity of establishing their loyalty in order to prosecute their claims. This result follows whether we regard the pardon as effacing the offence, blotting it out, in the language of the cases, as though it had never existed, or regard persons pardoned as necessarily excepted from the general language of the act, which requires claimants to make proof of their adhesion, during the rebellion, to the United States. It is not to be supposed that Congress intended by the general language of the act to encroach upon any of the prerogatives of the President, and especially that benign prerogative of mercy which lies in the pardoning power. It is more reasonable to conclude that claimants restored to their rights of property, by the pardon of the President, were not in contemplation of Congress in passing the act, and were not intended to be embraced by the requirement in question. All general terms in statutes should be limited in their application, so as not to lead to injustice, oppression, or any unconstitutional operation, if that be possible. It will be presumed that exceptions were intended which would avoid results of that nature.*

Such being the general effect of pardon and amnesty

---

* United States v. Kirby, 7 Wallace, 482.

granted by the President, it only remains to consider whether the proclamation of December 25th, 1868, embraces the claimants who were aliens domiciled in the country, within its provisions. And upon this point we entertain no doubt. The claimants were residents in the United States prior to the commencement of the rebellion. They so allege in their petition; they were, therefore, bound to obey all the laws of the country, not immediately relating to citizenship, during their sojourn in it; and they were equally amenable with citizens for any infraction of those laws. "The rights of sovereignty," says Wildman, in his Institutes on International Law,* "extend to all persons and things not privileged that are within the territory. They extend to all strangers therein, not only to those who are naturalized and to those who are domiciled therein, having taken up their abode with the intention of permanent residence, but also to those whose residence is transitory. All strangers are under the protection of the sovereign while they are within his territories, and owe a temporary allegiance in return for that protection."

By allegiance is meant the obligation of fidelity and obedience which the individual owes to the government under which he lives, or to his sovereign in return for the protection he receives. It may be an absolute and permanent obligation, or it may be a qualified and temporary one. The citizen or subject owes an absolute and permanent allegiance to his government or sovereign, or at least until, by some open and distinct act, he renounces it and becomes a citizen or subject of another government or another sovereign. The alien, whilst domiciled in the country, owes a local and temporary allegiance, which continues during the period of his residence.

This obligation of temporary allegiance by an alien resident in a friendly country is everywhere recognized by publicists and statesmen. In the case of Thrasher, a citizen of the United States resident in Cuba, who complained of inju-

* Wildman, p. 40.

ries suffered from the government of that island, Mr. Webster, then Secretary of State, made, in 1851, a report to the President in answer to a resolution of the House of Representatives, in which he said : " Every foreigner born residing in a country owes to that country allegiance and obédience to its laws so long as he remains in it, as a duty upon him by the mere fact of his residence, and that temporary protection which he enjoys, and is as much bound to obey its laws as native subjects or citizens. This is the universal understanding in all civilized states, and nowhere a more established doctrine than in this country." And again : " Independently of a residence with intention to continue such residence; independently of any domiciliation; independently of the taking of any oath of allegiance or of renouncing any former allegiance, it is well known that, by the public law, an alien or a stranger born, for so long a time as he continues within the dominions of a foreign government, owes obedience to the laws of that government, and may be *punished for treason* or other crimes as a native-born subject might be, unless his case is varied by some treaty stipulation."*

The same doctrine is stated in Hale's Pleas of the Crown,† East's Crown Law,‡ and Foster's Discourse upon High Treason,§ all of which are treatises of approved merit.

Such being the established doctrine, the claimants here were amenable to the laws of the United States prescribing punishment for treason and for giving aid and comfort to the rebellion. They were, as domiciled aliens in the country prior to the rebellion, under the obligation of fidelity and obedience to the government of the United States. They subsequently took their lot with the insurgents, and would be subject like them to punishment under the laws they violated but for the proclamation of the President of December 25th, 1868. That proclamation, in its comprehensive terms, includes them and all others in like situation. It grants " unconditionally, and without reservation, to all

---

\* Webster's Works, vol. vi, p. 526.    † Vol. i, chap. 10.
‡ Vol. i, chap. 2, sec. 4.    § Sec. 2, p. 185.

and to every person who, directly or indirectly, participated in the late insurrection or rebellion, a full pardon and amnesty for the offence of treason against the United States, or of adhering to their enemies during the late civil war, with restoration of all rights, privileges, and immunities under the Constitution and the laws which have been made in pursuance thereof."

The act of Congress of July 27th, 1868,* authorizes any alien to prosecute claims against the United States in the Court of Claims, where the government of which he is a citizen or subject accords to citizens of the United States the right to prosecute claims against such government in its courts. In O'Keefe's case† it was held that; by the proceeding known as a "petition of right," the government of Great Britain accords to citizens of the United States the right to prosecute claims against that government in its courts, and therefore that British subjects, if otherwise entitled, may prosecute claims against the United States in the Court of Claims, There is, therefore, no impediment to the recovery by the claimants in this case of the net proceeds of their cotton paid into the treasury.

The judgment of the Court of Claims must, therefore, be REVERSED, and that court directed to enter judgment in favor of the claimants for the amount of such net proceeds; and it is

So ORDERED.

---

* 15 Stat. at Large, 243.    † 11 Wallace, 178.