**SHINYU NORO et al. v. UNITED STATES.**
No. 10922.

Circuit Court of Appeals, Fifth Circuit.
April 24, 1945.

Rehearing Denied May 17, 1945.

Wm. C. Pierce, of Tampa, Fla., for appellants.

H. S. Phillips, U. S. Atty., of Tampa, Fla., John F. Costelloe and Sewall Key, Sp. Assts. to the Atty. Gen., and Samuel O. Clark, Jr., Asst. Atty. Gen., all of Washington, D. C., for appellee.

Before SIBLEY, WALLER, and LEE, Circuit Judges.

SIBLEY, Circuit Judge.

The appellants were indicted in six counts, five charging Noro with having wilfully and knowingly attempted to defeat a large part of his income taxes by making false returns, for the years 1936, 1937, 1938, 1939 and 1940, Goto aiding and abetting. The sixth count charges a conspiracy among them and another to do this. They were convicted on all counts, and a general sentence imposed of imprisonment for one year, and to pay the costs of prosecution. They appeal. The questions argued are: 1. Whether the entry of the place of business of appellants and the seizure of their account books was a violation of the Fourth Amendment of the Constitution prohibiting unreasonable searches and seizures, and the use of them in evidence violated the Fifth Amendment declaring that no person shall be compelled in any criminal case to be a witness against himself. 2. Whether the evidence supports the verdict.

The books seized, when later examined, included one set kept in Japanese, and one in English, covering each day's business with monthly totalings. They agreed as to payments out but the receipts were much larger, in some years three times larger, according to the Japanese books than as shown by the English books. The income tax returns followed the English books and the falsity in them is proved only by resort to the Japanese books. The propriety of the use of these books in evidence is vital to the case.

The search and seizure were admittedly without any search warrant or warrant of arrest. The justifying facts, also uncontested, are that Noro and Goto, though residing for years peaceably in the United States, are citizens of the Japanese Empire; that on Dec. 7, 1941, following the attack on Pearl Harbor, the Congress declared war on Japan; and the following evening, on specific instructions from the Secretary of the Treasury, and a proclamation by the President touching alien ene-

mies, appellants' place of business, a restaurant called Nikko. Inn, was entered and searched by customs officers, with orders to seize among other things the books of the business. Other Japanese business places in and around the City were similarly searched. Noro and Goto submitted to the search, pointed out the books, and were allowed to depart. No one was arrested.

On May 7, 1940, Sect. 5(b) of the Trading with the Enemy Act was so amended as to authorize the President during time of war or any period of national emergency declared by him, to investigate, regulate or prohibit certain commercial dealings in which foreign States or nationals were interested, and gave him power to require any person to give information about them "including the production of any books of account * * * in connection therewith in the custody or control of such person." 54 Stat. 179, 50 U.S.C.A.Appendix § 5(b). Section 2 of this legislation, 12 U.S.C.A. § 95 note, expressly confirmed action by the President which had vested these powers in the Secretary of the Treasury, and his regulations and rulings. Shortly before, the President had declared a period of national emergency and authorized the Secretary of the Treasury to proceed by licensing the business of certain nationals; and shortly afterwards the nationals of China and Japan were included. Nikko Inn had such a license from the Secretary of the Treasury. Promptly after Pearl Harbor, on Dec. 7, 1941, the Secretary revoked all licenses issued for the benefit of Japan or any national thereof, and ordered that customs officers and others take possession of the Japanese enterprises which had been licensed, and prevent access to, alteration or removal of books, files, accounts and other property of such enterprises. Before the Nikko Inn was taken into possession under this order, on Dec. 7, 1941, the President issued his proclamation No. 2525, 55 Stat. 1700, 6 Fed.Reg. 6321, applicable to all land and water within the jurisdiction of the United States, forbidding any alien enemy to have in possession, custody or control, besides firearms, ammunition, bombs, codes and ciphers, cameras, and the like, "papers, documents or books in which there may be invisible writing"; and all such property found in the possession of any alien enemy was declared subject to seizure and forfeiture. Matters so standing, the customs officers on Dec. 8, 1941, took possession of Nikko Inn, and of the books in question and all other papers found there. Shortly afterwards on Dec. 18, 1941, by the First War Powers Act, 55 Stats. 839, Congress provided expressly for such seizures, and in Sect. 302, 50 U.S.C. A.Appendix § 617, ratified and confirmed all actions and orders theretofore taken or issued by or pursuant to the direction of the President or Secretary of the Treasury under the former law. That same day the customs officers permitted an Internal Revenue Department representative to examine the books, which examination resulted in the assessment of deficiencies in taxes, and in this prosecution.

1. It was said in argument that in time of war alien enemies are not protected by the constitutional provisions in question. It may be true that they may by executive power be summarily arrested and interned and their property sequestered. Nevertheless we think that in a civil court trying an alien enemy for a crime committed in peace time, the constitutional safeguards of the accused ought to be maintained.

Therefore the accused may not in his trial be compelled to be a witness against himself. But this constitutional safeguard was not here violated. Neither of the accused testified at all. The written statements made by them and offered against them were excluded as not freely and voluntarily made. They were not required to produce in court any books or papers, as in Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746. It is true that during the search on May 8, 1941, they pointed out the box containing the books, but they were merely yielding to the search and the books would have been found and taken anyhow.

The question narrows to whether that search was an unconstitutional search. We think it was not. It is true that there had been time to get a search warrant to search Nikko Inn, if someone could have been found able to make oath to reasonable cause for a judicial officer under any law to issue one. But if issued a proper officer must have been found to serve it, and much routine followed out. With such searches in the sudden emergency of war necessary to be made throughout the country with all speed and efficiency, under the urgent orders of the President and Secretary of the Treasury, we hold the search and seizure, though without a warrant, was not unreasonable; and it is unreasonable searches and seiz-

ures alone that the Constitution forbids. This search and seizure was, as above recited, ratified by Congress ten days later, though we see no necessity for that. The ratification made it as good from the beginning as if Congress had on Dec. 8, 1941, specially authorized it. It is true the books and papers seized did not prove to have any invisible writing in them, or to relate to any prohibited trading with foreign countries; but being in the lawful possession of the officers of the United States, if they disclosed some other crime, they might be used to prove it. Gouled v. United States, 255 U.S. 298, 311, 41 S.Ct. 261, 65 L.Ed. 647. Neither the Constitution nor any statute in terms prohibits the use of the truth, even though unlawfully discovered, as evidence in the prosecution of a crime; but it is a federal judicial policy not to allow the agents and officers of the United States to break the law themselves and then use information so acquired to prosecute others. This rule of exclusion applies only to federal officers. In this case we are unable to see that the customs officers acted unlawfully, but only according to duty and with prudence and reasonableness. If, as suggested in argument, they had found the body of a murdered man in Nikko Inn, or evidence of any federal crime, they could tell about it. The books they found may likewise be permitted to speak.

2. The English books, on which the tax returns of Noro and Goto both were evidently based, say one thing. The Japanese books tell another story touching income. No explanation is offered. The jury could well conclude that the Japanese books, which only the Japanese could read, were for use among themselves and were true, no reason to make them false being apparent. The English books, which must then be the false ones, could be concluded to have been made for the very purpose for which they were used, to support false income tax returns. In this purpose Goto must have joined, for not only was he a partner in the business all the time, with access to the books, but he used the English books as the basis also of his own income tax returns. Moreover, in the returns of each, one-third of the income shown by the English books was returned, there being a third partner, Taniguchi, presumably equally interested. Taniguchi was also indicted, but had gone home to Japan. But there is evidence that in truth

through part or all of the time Noro had a half-interest and the others a fourth each. There was a tax advantage in dividing the income into thirds, because Noro was not married but the other two were, and their personal exemptions covered income that Noro would have had to pay taxes on if he returned his full one-half. This fact again would show cooperation between Noro and Goto. It was testified that Noro and Goto were shown the recomputations of their taxes and given opportunity to explain, but did not. On the trial they offered no explanations, either by their own testimony or any other. It is argued for appellants that the Japanese books are all in one handwriting, and that it was probably that of Taniguchi, who has vanished, and that he alone may be responsible for these books. Supposing he was the bookkeeper, we can conceive of no reason why he should have kept a false set of Japanese books for his own private use, nor why if they were private he did not take them with him or destroy them. The jury were the judges of the force of the facts, and the true conclusions to be drawn from them. There was no error in submitting the case to them. The moderate sentences would be supported by any one of the counts.

Judgment affirmed.