**EISLER v. UNITED STATES.**

No. 9582.

United States Court of Appeals
District of Columbia.

Argued April 5, 1948.

Decided June 14, 1948.
Writ of Certiorari Granted Nov. 8, 1948.
See 69 S.Ct. 130.

PRETTYMAN, Associate Justice dissenting.

Messrs. David Rein, of Washington, D. C., and Abraham J. Isserman, of New York City, with whom Mr. Joseph Forer, of Washington, D. C., was on the brief, for appellant.

Mr. William Hitz, Assistant United States Attorney, of Washington, D. C., with whom Mr. George Morris Fay, United States Attorney, of Washington, D. C., was on the brief, for appellee. Mr. Sidney Sachs, Assistant United States Attorney, of Washington, D. C., also entered an appearance for appellee.

Mr. Belford V. Lawson, Jr., of Washington, D. C., filed a brief on behalf of the National Lawyers Guild as amicus curiae, urging reversal.

Before CLARK, PRETTYMAN, and PROCTOR, Associate Justices.

CLARK, Associate Justice.

Appellant is an Austrian national who arrived in this country in 1941 as a political refugee, by virtue of a transit visa. On January 24, 1947, appellant was yet a temporary resident in this country and was on that date summoned by authority of the House of Representatives, through its Committee on Un-American Activities,[1] to appear as a witness before that Committee on February 6, 1947. On January 31, 1947, the Chairman of the Committee wrote a letter to the Attorney General of the United States informing the latter that a subpoena had been served on appellant and requesting assistance in the following manner: "The hearing which opens on February 6 will be of extreme importance, and it is necessary that Eisler be prohib-

---

[1] Hereinafter referred to as the Committee.

ited from departing from the United States or disappearing or refusing to appear. I have been reliably informed that he is endeavoring to take such steps. For this reason, I am requesting, as Chairman of the Committee on Un-American Activities, that you direct the agents of the FBI to put Eisler under an immediate twenty-four hour surveillance in order to insure his appearance before our Committee."

Subsequently, on February 4, 1947, appellant was arrested by two security officers of the Immigration and Naturalization Service, Department of Justice. On February 6, 1947, appellant appeared before the Committtee in the custody of the security officers, accompanied by his legal counsel. When he was called as a witness the following colloquy ensued:[2]

The Chairman.[3] Now, Mr. Stripling. call your first witness.

Mr. Stripling. Mr. Gerhart Eisler, take the stand.

Mr. Eisler. I am not going to take the stand.

Mr. Stripling. Do you have counsel with you?

Mr. Eisler. Yes.

Mr. Stripling. I suggest that the witness be permitted counsel.

The Chairman. Mr. Eisler, will you raise your right hand?

Mr. Eisler. No. Before I take the oath—

Mr. Stripling. Mr. Chairman—

Mr. Eisler. I have the floor now.

Mr. Stripling. I think, Mr. Chairman, you should make your preliminary remarks at this time, before Mr. Eisler makes any statement.

Mr. Chairman. Sit down, Mr. Eisler. Now, Mr. Eisler, you will be sworn in. Raise your right hand.

Mr. Eisler. No.

The Chairman. Mr. Eisler, in the first place, you want to remember that you are a guest of this Nation.

Mr. Eisler. I am not treated as a guest.

The Chairman. This committee—

Mr. Eisler. I am a political prisoner in the United States.

The Chairman. Just a minute. Will you please be sworn in?

Mr. Eisler. You will not swear me in before you hear a few remarks.

The Chairman. No; there will be no remarks.

Mr. Eisler. Then there will be no hearing with me.

The Chairman. You refuse to be sworn in? Do you refuse to be sworn in, Mr. Eisler?

Mr. Eisler. I am ready to answer all questions, to tell my side.

The Chairman. That is not the question. Do you refuse to be sworn in? All right.

Mr. Eisler. I am ready to answer all questions.

The Chairman. Mr. Stripling, call the next witness. The committee will come to order, please. What is the pleasure of the committee?

Mr. Stripling. Mr. Chairman, I think that the witness should be silent, or take the stand or be removed from the room, one or the other, until this matter is determined.

Mr. Mundt. Mr. Chairman, suppose you ask him again whether he refuses to be sworn.

Mr. Rankin not "sworn in," but to be sworn.

The Chairman. Mr. Eisler, do you refuse, again, to be sworn?

Mr. Eisler. I have never refused to be sworn in. I came here as a political prisoner. I want to make a few remarks, only 3 minutes, before I be sworn in, and answer your questions, and make my statement. It is 3 minutes.

The Chairman. I said that I would permit you to make your statement when the committee was through asking questions. After the committee is through asking

---

[2] According to the official transcript of the proceedings before the Committee, read into the record at the trial of this case.

[3] The Chairman of the Committee, who was presiding, was Representative J. Parnell Thomas. Mr. Stripling was the Committee's chief investigator. Mr. Mundt and Mr. Rankin were members of the Committee.

questions, and your remarks are pertinent to the investigation, why it will be agreeable to the committee. But first you have to be sworn.

Mr. Eisler. That is where you are mistaken. I have to do nothing. A political prisoner has to do nothing.

The Chairman. Then you refuse to be sworn.

Mr. Eisler. I do not refuse to be sworn. I want only 3 minutes. Three minutes to make a statement.

Mr. Chairman. We will give you those 3 minutes when you are sworn.

Mr. Eisler. I want to speak before I am sworn.

The Committee then voted to cite Mr. Eisler for contempt. Thereafter, on February 27, 1947, an indictment was returned by the Grand Jury for the District of Columbia charging appellant with a violation of 52 Stat. 942 (1938), 2 U.S.C.A. § 192.[4] Appellant was tried before a jury in the District Court of the United States for the District of Columbia and found guilty; he has appealed from the judgment of conviction.

■ At the outset we are confronted with the contention made by appellant that the trial judge erred in refusing to disqualify himself following the filing of appellant's affidavit of bias and prejudice. The Justice designated to preside at the trial of this case struck the affidavit, principally on the grounds that it was filed too late and that it was legally insufficient.

The statute[5] which allows the filing of such an affidavit requires that "Every such affidavit shall state the facts and the reasons for the belief that such bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term of the court, or good cause shall be shown for the failure to file it within such time." This case was originally set for trial on May 26, 1947. Several days prior to that date counsel for appellant requested a continuance of the argument on preliminary motions and of the trial. The Justice who had been designated to preside at the trial denied the continuance of the motions but granted continuance of the trial to May 27. Then, on May 23, the motions were argued and disposed of, and counsel for appellant requested a further continuance of the trial date because of the death of a brother of the chief trial attorney for the defense, which had occurred that day. The request was granted and the trial continued to June 4. We deem it necessary to set out these happenings with chronological references, for the affidavit of bias and prejudice was not filed by appellant until May 29. As has been noted, this was after two continuances had been granted by the Justice against whom the affidavit was directed; it was three days after the first trial date had passed, and only six days prior to the date when the trial actually began.[6]

Appellant contends he had no knowledge of the identity of the trial Justice prior to May 20, although in the usual course of affairs he should have received notice of the designation earlier than that time. Nevertheless, the delay then ensuing before the affidavit was filed is attributed to the death of a brother of the chief defense counsel and the asserted consequence that the latter was prevented from giving his immediate attention to the matter. The explanation is reasonable so far as it goes, but appellant had two other counsel of record, one of whom actually certified the affidavit submitted, and it is not shown that it was essential to delay the affidavit for the reason given. This court has demonstrated willingness to apply the

---

[4] The statute reads as follows: "Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months."

[5] Judicial Code, § 21, 36 Stat. 1090 (1911), 28 U.S.C.A. § 25.

[6] See Refior v. Lansing Drop Forge Co., 6 Cir., 1942, 124 F.2d 440.

statute with liberality, with respect to the time element, where good cause was shown for delay in filing the affidavit, but we are not moved in this case to do so. See Hurd v. Letts, 1945, 80 U.S.App.D.C. 233, 152 F.2d 121. '

We are of the opinion that the lower court properly determined, as the second ground for striking the affidavit, that it was legally insufficient to show personal bias or prejudice regarding the justiciable matter pending before the court. The Supreme Court has ruled that the judge has a lawful right to pass on the legal sufficiency of the affidavit, Berger v. United States, 1921, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481, subject to appellate review, of course, and we consider it the duty of the judge, when the showing for recusation is insufficient, to remain in the case.

The basis for disqualification upon affidavit is that the judge has personal bias ·or prejudice either against the affiant or in favor of an opposite party, by reason of which the judge is unable to impartially exercise his functions in the particular case. Ex parte American Steel Barrel Co., 1913, 230 U.S. 35; 33 S.Ct. 1007, 57 L.Ed. 1379. This court said, in Hurd v. Letts, supra:

"Nothing is now better established than the rule that a sufficient affidavit under the statute must state facts and reasons which tend to show personal bias and prejudice *regarding the justiciable matter pending* and must give support to the charge of a bent of mind that may prevent or impede impartiality of judgment. Berger v. United States, 255 U.S. 22, 33, 41 S.Ct. 230, 65 L.Ed. 481.

"Accordingly, the question in all such cases is whether the affidavit asserts facts from which a sane and reasonable mind might fairly infer personal bias or prejudice on the part of the judge. * * *" [7] (Italics supplied.)

In the affidavit filed in this case, appellant identifies himself as a "German Communist" ·and then attempts to show bias and prejudice on the part of the Justice assigned to conduct his trial by reflecting on the latter's background as a Special Assistant to the Attorney General of the United States. Appellant alleged, upon information and belief, that the judge had, in that prior capacity, directly assisted Federal Bureau of Investigation inquiries into the activities of aliens and Communists, including appellant. It was further alleged that the judge was a close personal friend of the Director of the FBI, whom appellant characterizes as "violently antiCommunist." The affidavit also contained an assertion that the judge had, in connection with his previous duties, sponsored legislation providing for the deportation of alien Communists. Upon review of such an affidavit we do not hesitate to uphold the ruling of the court below that the affidavit should be stricken, for it does not establish bias and prejudice in the personal sense contemplated by the statute, assuming truth in all the facts stated. Prejudice, to require recusation, must be personal according to the terms of the statute, and impersonal prejudice resulting from a judge's background or experience is not, in our opinion, within the purview of the statute. Hurd v. Letts, supra; Price v. Johnston, 9 Cir., 1942, 125 F.2d 806, certiorari denied, 1942, 316 U.S. 677, 62 S.Ct. 1105, 86 L.Ed. 1750; Simmons. v. United States, 5 Cir., 1937, 89 F.2d 591, certiorari denied, 1937, 302 U.S. 700, 58 S.Ct. 19, 82 L.Ed. 540; Craven v. United. States, 1 Cir., 1927, 22 F.2d 605, certiorari denied, 1928, 276 U.S. 627, 48 S.Ct. 321, 72 L.Ed. 739; United States v. 16,000 Acres of Land, More or Less, in LaBette· County, Kansas, D.C.Kan., 1942, 49 F. Supp. 645.

The affidavit serves as a starting point for an effort to becloud the real issue in the case. Despite the fact that appellant was on trial for contempt of a Congressional investigating committee, and not for his political beliefs, the record shows repeated attempts by defense counsel to raise appellant's self-styled status as a "political refugee" and "German. Communist" to a level of decisive importance in the case. During the course of the trial defense counsel sought to introduce evidence to show that the Commit--

[7] 80 U.S.App.D.C. 233, 234, 152 F.2d 121, 122.

tee's real purpose in summoning appellant was "to harass and punish him for his political beliefs * * * and that the Committee acted for ulterior motives not within the scope of its or Congress' powers." The lower court properly refused to admit such evidence, on the ground that the court had no authority to scrutinize the motives of Congress or one of its committees. It is beyond question, as the result of venerable Supreme Court decisions, that either House of Congress has power to issue process to compel private individuals to appear and give testimony, in aid of the legislative function. McGrain v. Daugherty, 1927, 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580, 50 A.L.R. 1; Sinclair v. United States, 1929, 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692.

Appellant was summoned to appear before the Committee in the same manner that many citizens of the United States had been previously summoned. The fact that he was arrested and escorted to the Committee hearing by federal officers did not mitigate his obligation to give testimony; the arrest, if actually unlawful as appellant contended, was a matter to be contested by appellant in a judicial proceeding, if he so desired, and was irrelevant to the proceedings before the Committee. The arrest was accomplished under Presidential warrant—the power of the Executive to order the arrest was subject to scrutiny by the Judiciary, which stood ready to guarantee due process of law had appellant desired to properly invoke judicial determination of that question. Consequently the repeated attempts by defense counsel to elicit testimony regarding the arrest were defeated, and properly so, in the trial court, for such evidence was immaterial to the issues in this case.

Although he is an alien, appellant stood before the Committee in much the same position as does any citizen of the United States. Once an alien lawfully enters and resides in this country he becomes invested with the rights, except those incidental to citizenship, guaranteed by the Constitution to all people within our borders. See Mr. Justice Murphy, concurring, Bridges v. Wixon, 1945, 326 U.S. 135, 161,

65 S.Ct. 1443, 89 L.Ed. 2103. Correlatively, an alien resident owes a temporary allegiance to the Government of the United States, and he assumes duties and obligations which do not differ materially from those of native-born or naturalized citizens; he is bound to obey all the laws of the country, not immediately relating to citizenship, and is equally amenable with citizens for any infraction of those laws. Carlisle v. United States, 1872, 16 Wall. 147, 21 L.Ed. 426; Leonhard v. Eley, 10 Cir., 1945, 151 F.2d 409, and cases cited therein. The alien resident may be required to make contribution to the support of our Government; in Leonhard v. Eley, supra, and in United States v. Lamothe, 2 Cir., 1945, 152 F.2d 340, it was held that an alien may lawfully be inducted for national defense service in time of war. To continue exemplification of the general lack of discrimination against aliens, it has been held that an alien enemy under criminal prosecution in a United States civil court must be afforded the usual constitutional safeguards. Shinyu Noro v. United States, 5 Cir., 1945, 148 F.2d 696.

It follows, then, that appellant's lack of citizenship did not raise a bar to his being summoned by a Congressional investigating committee for aid in securing its purpose. We need not review here the question whether the inquiries pursued by this Committee are constitutionally lawful, which is raised by appellant for this court and the Second Circuit Court of Appeals have recently examined the question at length and answered affirmatively. Barsky v. United States, 1948, 83 U.S.App.D.C. ——, 167 F.2d 241; United States v. Josephson, 2 Cir., 1947, 165 F.2d 82, 92, certiorari denied, 1948, 333 U.S. 838, 68 S.Ct. 609.

Having been summoned by lawful authority, appellant was bound to conform to the procedure of the Committee. Townsend v. United States, 1938, 68 App.D.C. 223, 95 F.2d 352, certiorari denied, 1938, 303 U.S. 664, 58 S.Ct. 830, 82 L.Ed. 1121. It was established at the trial of this case by the testimony of the Chairman of the Committee that it was customary procedure to allow witnesses to state legal objections to the jurisdiction of the Commit-

tee before they were required to be sworn. Appellant attempted to argue that such was his purpose in seeking leave to "make a few remarks" before he was sworn. The record shows an outright refusal by appellant, when he was first called as a witness, to take the stand and give testimony; his refusal was later conditioned upon a request for time to "make a few remarks," but he did not at any time inform the Committee of his desire to state legal objections to the jurisdiction of the Committee. Testimony given at the trial by the Committee Chairman and the Committee's chief investigator showed that appellant conveyed the impression he would consume much more than the 3 minutes he requested if he were allowed time for preliminary remarks, since he held what appeared to be a lengthy mimeographed statement, which was later distributed to the press as appellant left the hearing room. Appellant's request for time to make preliminary remarks was treated in accordance with Committee procedure: the Chairman promised time for such remarks at the conclusion of Committee questioning. It is important to note that appellant was accompanied to the hearing by his legal counsel, who testified at the trial that she was familiar with the course of practice before Congressional investigating committees and had advised appellant, prior to his appearance before the Committee, regarding hearing procedure.

 The profession of good faith by appellant regarding his refusal to comply with the demands of the Committee avails him nothing since there was ample evidence to demonstrate that his refusal was deliberate and intentional, which is sufficient to constitute a violation of the statute involved here. Fields v. United States, 1947, 82 U.S.App.D.C. 354, 164

F.2d 97, certiorari denied, 1948, 332 U.S. 851, 68 S.Ct. 355. A person summoned to appear before a Congressional committee may refuse to answer questions and submit to a court the correctness of his judgment in doing so, but a mistake of law is no defense, for he is bound to rightly construe the statute involved. Townsend v. United States, supra. Had appellant taken the oath and submitted to interrogation, in orderly fashion and in conformity with the rules and practices of the Committee (applicable to citizens and aliens alike), he could properly raise the question at any time as to whether the Committee, by any particular inquiry directed to him, was then actually exceeding proper constitutional limitations. Sinclair v. United States, supra; McGrain v. Daugherty, supra; In re Chapman, 1897, 166 U.S. 661, 17 S.Ct. 677, 41 L.Ed. 1154; Kilbourn v. Thompson, 1880, 103 U.S. 168, 26 L.Ed. 377. Appellant could not impose his own conditions upon the manner of inquiry, and the trial court rightly instructed the jury to that effect.

 The request made of the appellant by the Committee Chairman that he should be "sworn in" was the usual practice preceding testimony by a witness. Appellant's replies show he explicitly acknowledged the request as nothing more than that, and that his refusal to be sworn as a witness effectively constituted a refusal to give testimony, except upon conditions which he was not entitled to interpose. We think the indictment [8] sufficiently stated an offense, and find no solid ground for the contention advanced that if this indictment be upheld then one who for conscientious scruples insisted on affirming rather than swearing could likewise be indicted and convicted, since the indictment does not negative a willingness to affirm.

---

[8] The indictment, after citing the authority for the creation of the Committee, charged:

"Gerhart Eisler, having been summoned as a witness by the authority of the House of Representatives, through its Committee on Un-American Activities, to give testimony before the said Committee at its session within the District of Columbia on February 6, 1947, upon matters of inquiry committed to said Committee by Public Law No. 601, Section 121 [60 Stat. 822] and aforesaid Resolution 5, did appear before the said Committee, on February 6, 1947, and was directed to be sworn to testify upon said matters, and the said Gerhart Eisler thereupon failed and refused so to be sworn to testify, and thereby on February 6, 1947, within the District of Columbia, willfully did make default."

Rule 7(c) of the Federal Rules of Criminal Procedure, 18 U.S.C.A. following section 687, requires only that the indictment contain "a plain concise and definite written statement of the essential facts constituting the offense charged." The indictment returned in this case sufficiently met that requirement, and there was no attempt to prosecute appellant for refusing to take an oath, except insofar as that act represented refusal to give testimony before the Committee. There was no objection raised by appellant to his taking an oath; indeed, appellant expressly stated his willingness to take an oath if the Committee would accede to the conditions he sought to impose.

 It is further contended on behalf of appellant that he appeared before the Committee in the status of an interned enemy alien and as such could not be required to give testimony on any matter of consequence to the Committee. But the arrest of appellant by security officers of the Immigration and Naturalization Service did not nullify the subpoena previously issued in a lawful manner by the Committee. And if the detention of appellant amounted to internment and hence clothed him with the protection of Article 5, Geneva Convention on Prisoners of War,[9] we cannot indulge the presumption that the Committee would violate whatever rights were secured to appellant by virtue of Article 5.[10] Appellant, by his conduct before the Committee, refused to be sworn or to answer any questions whatsoever, and is thereby precluded from enjoying the benefit of what force there might be in this argument. "The mere possibility that the power of inquiry may be abused 'affords no ground for denying the power.'" Barsky v. United States, supra, 167 F.2d 241, 250, citing McGrain v. Daugherty, 1927, 273 U.S. 135, 175, 47 S.Ct. 319, 71 L.Ed. 580, 50 A.L.R. 1.

 Appellant contends that he did not receive a fair trial, raising the contention initially on the basis of the entire record, which we have carefully examined, although we do not sanction such a general averment. As a result of that examination we conclude that appellant did receive a fair trial. The specific averments of hostility and bias on the part of the trial judge set forth by appellant actually indicate, in our opinion, proper attempts to confine the trial of the case to the pertinent issues presented. Defense counsel persistently attempted to adduce immaterial and irrelevant evidence, and the fact that a great number of rulings adverse to appellant were naturally elicited from the trial court contributes nothing to an assertion of hostility and bias. The judge is invested with authority to control the trial procedure, and it is his duty to restrict the evidence to the issues of the case. The collateral contention that the trial judge unduly intervened in the examination and cross-examination of witnesses evokes restatement of a portion of this court's opinion in Griffin v. United States, 83 U.S.App. D.C. ——, 164 F.2d 903, 904: "* * * few rules are better settled, so far as the federal courts are concerned, than the right of a trial judge to make proper inquiry of any witness when he deems that the end of justice may be served thereby and for the purpose of making the case clear to the jurors." There was no violation of that right in the trial below; we find no instance among those complained of where the trial judge's intervention in the questioning by counsel was improper or not obviously calculated to make the case clear to the jurors.

 Our review of the record in this case has failed to disclose compelling reasons for reversing the judgment of the District Court. Accordingly, the judgment is affirmed.

Affirmed.

PRETTYMAN, Associate Justice (dissenting).

I disagree with my brethren and, because of the nature of the case, think I should

---

[9] 47 Stat. 2030 (1929).

[10] Article 5 contains the following provision: "No coercion may be used on prisoners to secure information relative to the condition of their army or country. Prisoners who refuse to answer may not be threatened, insulted, or exposed to unpleasant or disadvantageous treatment of any kind whatever." 47 Stat. 2031 (1929).

state the critical points upon which I would reverse the judgment below:

## I

I think that the affidavit of bias and prejudice filed by the appellant in the trial court was sufficient under the statute to require the disqualification of the judge to whom it was addressed, and that the affidavit was filed in time.

The affidavit says:

"b) * * * At a hearing of the Un-American Activities Committee on February 6, 1947, out of which this very cause arose there was placed into the record a statement of J. Edgar Hoover, director of the Federal Bureau of Investigation which was allegedly a report of an investigation of my activities by the Federal Bureau of Investigation over many years. Moreover, this report is set forth in full at pages 11–12 of the Committee hearings of February 6, 1947. This report indicates strong personal bias and prejudice against me. During the period of the investigation and until his elevation to the bench in September, 1945, Justice Holtzoff acted as special assistant to the Attorney General assigned to the Federal Bureau of Investigation. His duties were concerned especially with the investigation by the F.B.I. into the activities of aliens and communists, into both of which categories I fall. * * *

* * * * * *

"d) In connection with his duties as United States attorney assigned to the F.B.I., Justice Holtzoff advised J. Edgar Hoover as to steps and actions to be taken against alien communists, such as myself. * * *

"e) * * * Justice Holtzoff was legal advisor to the F.B.I. at the time the investigation of me was commenced and continued as such until September, 1945. Upon information and belief, he figured in an important capacity in advising and aiding and determining the policy, nature, scope and objectives of the investigation directed against aliens and communists, which necessarily included myself."

In sum, the affidavit says that prior to his elevation to the bench the trial judge had been the active legal advisor to the investigator in the very investigation out of which this case arose, which investigation involved this appellant, among others.

The statute is quite succinct and clear:

"Whenever a party to any action or proceeding, civil or criminal, shall make and file an affidavit that the judge before whom the action or proceeding is to be tried or heard has a personal bias or prejudice either against him or in favor of any opposite party to the suit, such judge shall proceed no further therein, * * *."[1] It is established that upon the filing of an affidavit under this statute the court may determine the legal sufficiency of the affidavit upon the facts as stated but may not give any consideration to the truth or falsity of the alleged facts; the alleged facts must be assumed to be true.[2]

So the simple question here is whether the fact that the trial judge had been the active legal advisor to the investigator in the very investigation which gave rise to the indictment of the defendant, is legally sufficient as a basis for a belief of personal bias. I think it clearly is.

In Barsky v. Holtzoff[3] we held almost identical allegations to require the disqualification of the judge. This case is not like Lawson v. Curran,[4] in which there was merely a general allegation that the judge had prosecuted cases involving similar offenses.

Many able and conscientious lawyers and judges—and the trial judge here involved is certainly both—have a deep and abiding conviction of their own abilities to prosecute impersonally and to judge impersonally, and to do both in the same case. But such psychological detachment is not so well established that a belief to the contrary is unreasonable. That a judge has been the

---

[1] 36 Stat. 1090 (1911), 28 U.S.C.A. § 25.

[2] Berger v. United States, 1921, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481; Scott v. Beams, 10 Cir., 1941, 122 F.2d 777, 788, and cases cited; Mitchell v. United States, 10 Cir., 1942, 126 F.2d 550.

[3] Misc. No. 126, U.S.App.D.C., June 11, 1947 [no opinion for publication] (petition for mandamus granted).

[4] Misc. No. 142, U.S.App.D.C., April 13, 1948 [no opinion for publication] (petitions for mandamus and for leave to file petition for writ of prohibition denied).

prosecutor in the early stages of a particular case against a particular individual is a fact "from which a sane and reasonable mind might fairly infer personal bias or prejudice on the part of the judge." Hurd v. Letts, 1945, 80 U.S.App.D.C. 233, 234, 152 F.2d 121, 122. In the case just cited, this court established that test for disqualification.[5] The statute says "bias or prejudice", evidently meaning to include bent of mind as well as aggressive antipathy.

The statute[6] speaks of filing ten days before the term of court, but that provision was designed for district courts which have periodical terms and in which the identity of the trial judge is known well in advance. In this jurisdiction, the District Court consists of twelve judges who serve in rotation, or upon assignment, in the several branches of the court. The court is in continuous session, except for the summer. Thus, the name of the trial judge may not be known until shortly before the trial; as a matter of fact, several different methods of assigning criminal cases for trial have been experimented with in recent years. It is settled that in this jurisdiction the ten-day provision of the statute is impractical in application and, instead, the rule of "due diligence" must be applied.[7] This is permissible under the clause of the statute which excepts from the ten-day requirement cases in which "good cause shall be shown for the failure to file it within such time."

Appellant and his counsel first knew on May 20, 1947, of the assignment of this case to Judge Holtzoff for trial.[8] Appellant was in New York. His principal attorneys were in Washington. On that same day he inquired of them whether he was obliged to go to trial before Judge Holtzoff, in view of the judge's previous connections with the F.B.I. Counsel arranged to discuss the matter in Washington on May 23rd. They did so, but the principal counsel received a wire during that morning announcing the sudden death of his brother. This disrupted the conference, and, as a matter of fact, on that basis the court continued the trial to June 4th. The affidavit was finally executed in New York on May 28th and was filed here on May 29th. The trial was actually begun on June 4th.

It seems to me that under the foregoing circumstances the filing of the affidavit nine days after the identity of the trial judge was ascertained came within "due diligence". There was an unforeseeable and unavoidable interruption during those nine days. The affidavit was filed six days before the trial, and other judges were available so that the trial would not have been delayed. Affiant could well have known that with twelve active judges on this District Court, no delay in trial would result from the disqualification of one of them. Moreover, these affidavits should be prepared with the utmost care and certainty as to the facts. The courts should encourage careful consideration and deliberation on the part of counsel. It seems to me to be a grave mistake to hold that such affidavits must be filed almost instantaneously after the identity of the trial judge is ascertained. Such a rule will almost make mandatory the filing of the affidavit without deliberate and careful consideration of counsel. The rule ought to be that they be filed with the utmost deliberation consistent with the undelayed dispatch of the business of the court.

## II

I think the court erred in refusing to permit appellant to prove what he intended to say to the Committee when he asked for three minutes before being sworn.[9]

---

[5] Upon the general subject, see Frank, Disqualification of Judges, 56 Yale L.J. 605, 626 et seq. (1947).

[6] Supra note 1.

[7] While not expressly recited as "due diligence", this has been the doctrine underlying cases such as Hurd v. Letts, supra, and Laughlin v. United States, 1945, 80 U.S.App.D.C. 101, 151 F.2d 281.

[8] Appellee Government says that the date is not shown in the record but says that appellant "concedes" and "admits" that it was "about" May 20th.

[9] The Government says that appellant was permitted to answer, but the record, at pages 133 to 135 of the printed appendix before us, shows plainly that he was not, and his proffer of proof was denied. The denial was repeated (pages 138, 139 and 149 of the appendix). The Government also attempts to show that in the requested three minutes appellant intended to attempt to read a 20-page mimeographed statement, but the evidence is perfectly clear that that statement was prepared to be read after the

Appellant was convicted of violation of Section 192, Title 2, of the United States Code Annotated.[10] That statute is in two parts.[11] The first relates to a person who having been summoned as a witness "upon any matter under inquiry" before a committee of Congress, "willfully makes default". The second part refers to a person who, having appeared as a witness, "refuses to answer any question pertinent to the question under inquiry". The indictment against appellant charged that, having been summoned as a witness to give testimony before the Committee "upon matters of inquiry committed to said Committee * * *, [he] did appear before the said Committee * * * and was directed to be sworn * * * and * * * thereupon failed and refused so to be sworn to testify, and thereby * * * willfully did make default." Thus, the indictment was for willfully making default. "Willfully" in this statute means deliberately or intentionally.[12]

The Chairman of the Committee evaded answering the questions of defense counsel as to the procedure which the Committee had established in respect to the notation of legal objections, but the plain inference of his testimony is that the established procedure was to allow a witness to make his legal objections before being sworn. The purport of appellant's offer of proof was that he had intended to interpose legal objections to being compelled to testify. That proffer must be viewed in the setting of the Committee hearing. The testimony of the Committee Chairman was that the Committee room was "jammed packed with people", and the chief investigator of the Committee testified that there were quite a few photographers present taking photographs. The entire colloquy, which takes a little less than two pages of print, could hardly have taken more than a few minutes. It is true that appellant did state that he was not going to take the stand and refused to be

sworn, but he said twice, "I am ready to answer all questions," and twice he said, "I do not refuse to be sworn." Twice he said that he wanted to speak before he was sworn, and twice he quite definitely said that he wanted only three minutes.

If it was the established practice that legal objections be stated by the witness before he was sworn, and if appellant could prove that all he wanted to do was to state his legal objections and thereafter be sworn and "answer all questions", I do not see how he could be held guilty of "willful" default. While bad faith is not an element of willfulness, intent is. Appellant was entitled to prove that he had no intent to refuse to testify but merely wanted to follow the established practice.

The trial court made some reference to appellant's position being that he wished to impose conditions upon his testifying, but I see no merit in that suggestion, if, as a matter of fact, appellant was merely attempting to comply with the established procedure.

III

I also think that judgment of acquittal should have been directed on the ground that the Government failed to prove that appellant was summoned to testify in a matter of inquiry submitted to the Committee by the Congressional Resolution. This record does not show, and we do not yet know, what it was that the Committee wanted appellant to testify about. The subpoena merely directed the marshal to summon him "to testify touching matters of inquiry committed to said Committee"; it did not describe or name any such matter. He was not told by anybody, so far as the record shows, what the matters were concerning which he was to testify. There is no shred of evidence that he was summoned as a witness upon a matter under inquiry before the Committee, but the statute requires that he must have been summoned upon such a matter. The necessity of proof on the

witness had testified, and contemplated that he would have been sworn. The proffer of proof indicated that he also had a few written notes, relating to legal objections, which he intended to use in the three minutes.

[10] R.S. § 102 (1857), as amended, 52 Stat. 942 (1938).
[11] United States v. Murdock, 1931, 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210, 82 A.L.R. 1376.
[12] Fields v. United States, 1947, 82 U.S.App.D.C. 354, 164 F.2d 97, 100.

point seems to me to be an unavoidable conclusion from the constitutional principles laid down in Kilbourn v. Thompson,[13] McGrain v. Daugherty,[14] and Sinclair v. United States.[15]

The Government says that United States v. Josephson[16] disposes of this point. But it does not. The Second Circuit was exceedingly meticulous about it. Josephson was not indicted for default; he was indicted, under the second part of the statute, for refusing to answer pertinent questions. Therefore, the court held, expressly and carefully, that no question of willfulness was involved and that the refusal to answer any question was a refusal to answer any pertinent question. We do not have that situation here.

## IV

I do not share the view of my brethren in respect to the general conduct of the trial. It is not possible in the short space of an opinion to relate all the incidents which occurred during the course of the trial, and severally and alone they might not constitute ground for reversal, but, when coupled with the considerations already discussed, they make certain the necessity of reversal, in my opinion.

---

[13] 1881, 103 U.S. 168. 26 L.Ed. 377.
[14] 1927, 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580, 50 A.L.R. 1.
[15] 1929, 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692.
[16] 2 Cir., 1947, 165 F.2d 82.